[Crim. No. 22562. May 12, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
LYNN BERNARD MILNER, Defendant and Appellant.

COUNSEL

Gary Goodpaster, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama and Edward P. O'Brien, Assistant Attorneys General, Ronald E. Niver, Linda Ludlow, Nathan D. Mihara and Morris Beatus, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PANELLI, J.—Defendant Lynn Bernard Milner was convicted of first degree murder (Pen. Code, § 187)[1] and robbery (§ 211), both with use of a deadly weapon (§ 12022, subd. (b)). A special circumstance allegation that the murder was committed in the course of a robbery was found true (§ 190.2, subd. (a)(17)(i)). The jury sentenced defendant to death; this appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We affirm the judgment as to guilt and the special circumstance finding. We reverse the judgment as to penalty under compulsion of *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], because after a review of the record we determine that the jury was misled as to its sentencing discretion. (See also, *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440].)

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

## I. FACTS

On February 1, 1980, defendant, then 19 years old, entered Gamble's clothing store (Gamble's) after the last customer had left, between 8:30 and 9 in the evening. He had been employed at Gamble's for two weeks in the fall of 1979.

About 9 p.m., maintenance man Richard Rivas noticed two men struggling at the back of the store.[2] The iron grating that closed the customer entrance at the front of the store was pulled down. Rivas was close enough to observe that one of the men was blond and the other wore his hair in a "natural" afro style. After seeing that the man with the afro was striking the blond man, Rivas ran for help. When Rivas returned with Officer Dean Reese, no activity was visible from outside the store. Reese radioed for help and then entered the store from the back service entrance.

Inside, Reese saw blood spattered on the wall. He heard moaning as he entered the main room where a blond-haired man, later identified as Charles Street, was lying across a fallen clothes rack. Blood was pumping from a large wound in his chest. He died shortly thereafter. Street was the manager with whom defendant had worked while employed at Gamble's.

The coroner's report revealed that Street had been stabbed twice, in the chest and in the back. Either wound was sufficient to cause death. Also, Street's face was bruised and lacerated in a manner consistent with having received blows from a fist.

Reese found defendant crouched next to the counter near the cash register. He found no weapons in a patdown of defendant's person, but found currency and rolled coins in his pockets. A roll of coins, currency, and a knife with broken blade were found in the area where defendant had been crouched. Another portion of the blade was found in the stab wound in Street's back. Defendant's fingerprint was later found on the knife handle. There was blood on the glove that defendant wore on his left hand, as well as on his clothes and on his right hand, and on the coins and money.

On the morning following the arrest, Detective Don Myers interrogated defendant. According to Myers, defendant stated that he needed money and that he and Street had discussed the possibility of a sales job for defendant at Gamble's. Defendant also stated that he and Street were alone and that he did not remember having a fight with Street. Myers twice asked defend-

---

[2] Rivas was unavailable to testify at trial. His preliminary hearing testimony was read to the jury.

ant whether he had stabbed Street. Defendant responded once that he did not stab and once that he did not remember stabbing Street.

Defendant admitted to Myers that he was carrying the knife with which Street was killed when he entered the store. He maintained that he routinely carried the knife for protection. He also told Myers that he could not recall how the roll of coins and other cash had gotten into his pockets; he had entered the store with no money on his person.

Around 10:30 on the same morning, psychiatrist Dr. Mervyn Shoor examined defendant to determine his psychiatric status in connection with possible charges. During the interview, which lasted some 30 minutes, Shoor asked defendant whether he had killed Street. Defendant responded, "There's blood all over me." However, he was still unable to recall the stabbing.

Shoor formed the opinion that defendant was a man of above average intelligence who suffered from no psychiatric disability and that defendant's lack of memory of the actual killing was the result of suppressive or repressive forgetting that occurred *after* the stabbing rather than a symptom of a loss of conscious awareness that occurred during or before the murder.

Defendant was charged with murder and robbery. He pleaded not guilty and not guilty by reason of insanity. Pursuant to section 1027 the court ordered sanity examinations by Drs. Gershon Berman and Charles Casella. Their reports concluded that, despite his memory lapse, defendant was legally sane.

The prosecution proceeded to trial on both felony murder and premeditation and deliberation theories. Defendant's primary defense was diminished capacity at the time the crimes were committed.

Defendant testified in his defense that he went to Gamble's to apply for part-time work. After the last customer had left, he entered the store and had a "friendly" conversation with Street who agreed to talk to his boss about giving defendant a sales job. After Street had finished closing up, he and defendant walked through the hallway in the store toward the rear exit. As they approached the rear exit, defendant dropped his keys and, as he reached down to retrieve them, the knife began to slip from his pants pocket. Street saw the knife and a "peculiar" expression crossed his face. Defendant explained to Street that he carried the knife for protection. As he was repositioning the knife in his pocket, he felt a tremendous pain in the back of his head. He awakened to find himself on the floor by the sales counters with a bump on his head. Defendant believed that he had been

knocked unconscious and that someone else had committed the crimes of which he was accused.[3]

The testimony of three psychiatric specialists was offered to support the defense theory of diminished capacity.[4] Dr. Samuel Benson testified that he conducted a sodium amytal interview during which defendant was unable to remember stabbing Street when questioned directly about his involvement in the killing. However, in response to a query of *why* he had killed Street, defendant replied "Charlie was fucking with me."[5] Dr. Benson concluded that defendant had suffered from an acute anxiety and panic reaction that was precipitated by a dissociative reaction. He also opined that defendant was unable to form the specific intent to rob because, in a dissociative state, an individual is unable to interpret and perceive reality.

Dr. Allan Solomon interviewed defendant under hypnosis. He too testified that it was his opinion that defendant's lack of memory of the murder and robbery was due to a dissociative reaction that had occurred at the time of the killing. Solomon's theory was that the dissociative reaction was triggered by a homosexual panic. He also testified that defendant was incapable of forming a clear intent in the dissociative state.

Dr. Alfred Fricke was present at the Benson sodium amytal interview and also interviewed defendant independently, administering a battery of psychological tests. Fricke testified to his conclusions that defendant was of at least normal intelligence and that his amnesia was the result of repression of what had happened during the period he was unable to recall.[6]

To rebut the diminished capacity defense, the prosecution offered the testimony of Drs. Shoor, Casella and Berman. Dr. Berman testified that defendant was probably capable of forming the intent to steal on February 1, 1980.

Dr. Casella testified that the defense experts' dissociative-reaction diagnosis of defendant's amnesia was "very flimsy." He also characterized as unlikely the idea that the amnesia experienced by defendant was psychogenic, principally because it coincided with the exact time of the commission of the crimes with which he was charged and because there was nothing in his

---

[3] When cross-examined, however, he stated that he had, during the trial, become less certain about his innocence of the stabbing.

[4] A social worker, Dianne Barnhill, also testified on defendant's behalf. Her evaluative report was not inconsistent with the dissociative-reaction analysis offered by Dr. Benson.

[5] There is some testimony that indicates that he also stated during the interview that he stabbed Street in the side.

[6] All three doctors concluded that defendant's inability to recall the killing and robbery was not a fabrication.

history which would lead one to expect such an amnesia. Instead, he opined, "by far and away the most persuasive" explanation for defendant's inability to recall was fabrication.

Dr. Shoor also discounted the dissociative reaction defense. He testified that defendant's memory gap could best be explained "on the normal grounds that one would like to forget unpleasant situations." As noted, he believed defendant's amnesia was the result of conscious suppression or unconscious repression that occurred after the fact.

The jury was instructed on both felony murder and premeditated murder. The jury returned a verdict of first degree murder; the robbery special circumstance was found to be true.

At the sanity phase, after two days of testimony by prosecution and defense psychiatric experts[7] —testimony essentially the same as that presented at the guilt phase—the jury found that defendant was sane at the time of the robbery and murder.

## II. GUILT AND SANITY PHASE ISSUES

### A. *Miranda.*

Defendant moved pretrial to suppress the statements, and tapes and transcripts thereof, that he made to Officer Reese, Dr. Shoor, and Detective Myers, on grounds that *Miranda* warnings (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) either were not given or were improperly given. The motion was first continued by stipulation and then ordered off calendar without prejudice to renewal. Defense counsel never renewed the motion or otherwise objected to the testimony of Reese, Shoor, or Myers.

■ The general rule is that a defendant must make a specific objection on *Miranda* grounds at the trial level in order to raise a *Miranda* claim on appeal. (*People* v. *Crowson* (1983) 33 Cal.3d 623, 628 [190 Cal.Rptr. 165, 660 P.2d 389]; *People* v. *Green* (1982) 134 Cal.App.3d 587, 589 [184 Cal.Rptr. 652]; *People* v. *Bennett* (1976) 60 Cal.App.3d 112, 116-117 [131 Cal.Rptr. 305].) Defendant argues that, notwithstanding counsel's failure to renew, the trial court had a sua sponte duty to ascertain whether his *Miranda* waivers were voluntary. In the alternative, defendant asserts that trial counsel was constitutionally ineffective in failing to pursue the motion to suppress the statements made to Dr. Shoor and to Detective Myers.

---

[7]The only prosecution psychiatrist at the sanity phase was Dr. Shoor.

### 1. *Court's Sua Sponte Duty.*

■ Defendant concedes that, unless the issue is raised by counsel, trial courts generally are not required to rule on the voluntariness of a defendant's confession or admission. Nevertheless, he argues that there is an exception to the rule when a trial judge "reasonably has notice" of an issue regarding the voluntariness of a confession or waiver.

*People* v. *Bennett* (1976) 58 Cal.App.3d 230 [129 Cal.Rptr. 679] and *People* v. *Blair* (1975) 51 Cal.App.3d 480 [124 Cal.Rptr. 123], upon which defendant relies, are inapposite because in those cases, unlike the case at bar, the defendant raised a *Miranda* objection at trial.

Defendant also relies on language in *People* v. *Mosher* (1969) 1 Cal.3d 379, 397 [82 Cal.Rptr. 379, 461 P.2d 659], where, after reversing on other grounds, we stated: "The court should have determined, outside the hearing of the jury, whether the waiver was voluntary, particularly in view of the expressed doubts as to the defendant's mental competency, the absence of a signed waiver, and defendant's apparent lack of counsel with whom to consult so soon after his arrest. (*Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205].) We expect that the trial court will follow the correct procedure on retrial."

No *Miranda* objection had been made at trial in *Mosher, supra,* 1 Cal.3d 379, and, when taken out of context, the quotation may suggest a sua sponte duty such as that now advanced by defendant. However, our statement in *Mosher* was dictum, unnecessary to the holding of the case, which concerned an improper jury instruction. Further, there is no suggestion in *Mosher* that the court's failure to determine voluntariness sua sponte would have constituted reversible error. Finally, no subsequent case has cited *Mosher* for the proposition that trial courts have a duty to raise and rule on the voluntariness of a defendant's statements absent some objection raised by counsel. In *In re Terry* (1971) 4 Cal.3d 911, 923-924 [95 Cal.Rptr. 31, 484 P.2d 1375], we expressly rejected that idea, stating, " '*Jackson* does not require the trial judge to hold a preliminary hearing sua sponte regarding the voluntariness of a defendant's confession or admission . . . .' "

We conclude, therefore, that the trial court's failure to sua sponte determine the voluntariness of defendant's waivers did not constitute error.

### 2. *Ineffective Assistance of Counsel.*

■ Defendant also argues that trial counsel was constitutionally ineffective for failure to renew the motion to suppress.

Appellate courts reverse convictions on the ground of inadequate assistance of counsel *only* when the record affirmatively reveals that counsel had *no rational tactical purpose* for an allegedly incompetent act or omission. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144].) A reviewing court will not second-guess trial counsel's reasonable tactical decisions. (*People* v. *Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

The record in this case establishes the following pertinent facts: About 4:30 a.m. on the morning after his arrest, defendant was awakened and interviewed by Detective Myers. Myers testified that he read defendant his *Miranda* rights before interviewing him and that defendant waived his rights. Defendant testified that Myers did not read him his rights.

Six hours after the Myers interview, Dr. Shoor interviewed defendant. Shoor testified that before his interview, a Lieutenant Scott read defendant his rights.[8] Shoor himself warned defendant of his right to remain silent and that anything he said during the interview could be used against him at trial. According to Shoor, defendant indicated that he wanted to talk. Although Shoor testified that defendant was occasionally "somewhat fearful," there is nothing in the record to indicate that defendant wished to terminate the interview before Shoor finished his examination.

The record sheds no light on why counsel did not renew the motion to suppress defendant's statements to Myers and Shoor. We cannot say that counsel had no rational tactical purpose for his failure to renew. He may, for example, have chosen not to call attention to the discrepancy between the testimony of his client and that of the prosecution witnesses, foreseeing a credibility contest that defendant would not win. As stated in *Pope, supra,* 23 Cal.3d at page 426, when the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, judgments are affirmed "unless there simply could be no satisfactory explanation" for the challenged acts or omissions. On this record, defendant's ineffective assistance of counsel claim must be rejected.

B. *Exclusion of the Videotapes.*

■ Defendant contends that the court abused its discretion under section 352 of the Evidence Code in refusing to admit an edited videotape of the interview during which he was hypnotized by Dr. Solomon.

Solomon interviewed defendant on three occasions. He attempted to hypnotize defendant at each interview but was successful only on the first two

---

[8] Lieutenant Scott did not testify at the trial.

occasions. Only the second and third interviews were videotaped; there were, all told, 11 hours of tape. Solomon prepared an edited version, roughly an hour in length, of the second hypnotic interview in order to provide at trial "a visual record of the major points" to be made regarding defendant's mental condition.

At trial, defense counsel unsuccessfully sought to introduce the edited and the unedited videotapes to show the basis for Solomon's conclusion that defendant was hypnotized and for his theory that defendant's memory lapse was best explained by a dissociative reaction triggered by homosexual panic. The trial court had earlier indicated that it would not allow the tapes, edited or unedited, into evidence. After hearing further argument and testimony from Solomon regarding the videotapes, the court sustained the prosecution's objection to the introduction of the tapes. The refusal was premised expressly on Evidence Code section 352.[9] The court was concerned that the jury would be confused and misled by the tapes (edited *or* full-length version) and believed that viewing the tapes would be an undue consumption of time.[10]

Evidence Code section 352 permits the trial court "to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption." (*People* v. *Lavergne* (1971) 4 Cal.3d 735, 744 [94 Cal.Rptr. 405 [484 P.2d 77].) The court's exercise of discretion in admitting or rejecting proffered evidence will not be disturbed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice. (*People* v. *Wein* (1977) 69 Cal.App.3d 79 [137 Cal.Rptr. 814]; accord *People* v. *Wagner* (1982) 138 Cal.App.3d 473, 481 [188 Cal.Rptr. 185]; *People* v. *Ramos* (1982) 30 Cal.3d 553, 598, fn. 22 [180 Cal.Rptr. 266, 639 P.2d 908].)

We reject defendant's assertion that none of the court's reasons for excluding the tapes was valid. The court's primary concerns were that the jury would be misled by the tapes and that they would unduly consume the

---

[9] Section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[10] The trial court noted that "the edited version takes things out of context by necessary implication and violates the best evidence rule" and the unedited version would burden the court and the jury. Both versions, added the court, contained material that was not admissible in evidence and posed dangers of staging a version not subject to cross-examination and "unduly distracting" where "the jury would lose sight of the main issues." The court concluded that "the doctor's testimony on the stand is an adequate basis for describing what he saw on the tapes that were of importance to him" and adequate for the jury's resolution of the issues before it.

court's time. As defendant concedes, the tapes were relevant only to establish the basis for the doctor's opinions. They were irrelevant to the question of defendant's guilt or innocence. There is a risk, however, that the jury may consider the collateral evidence for the truth of its content, and where that danger exists, the evidence may be excluded. (See, e.g., *People* v. *Coleman* (1985) 38 Cal.3d 69, 93 [211 Cal.Rptr. 102 [695 P.2d 189] [unrealistic to expect jury to disregard truth of assertions contained in letters].)

Moreover, the doctor testified at length regarding the portions of the interviews that were important to the formation of his opinion. Thus, the tapes—especially the edited version which purportedly contained only the bases for the major points of his opinion—were cumulative. (See *People* v. *Odom* (1980) 108 Cal.App.3d 100, 115-116 [166 Cal.Rptr. 283] [exclusion of reports relied on by expert witness proper where expert testified about the reports].)

We are persuaded that the court did not abuse its discretion by exclusion of the videotapes under Evidence Code section 352.[11]

C. *Disclosure and Use of Protected Material.*

At trial, on request of the prosecutor, defense counsel voluntarily disclosed the transcripts of the three interviews conducted by Dr. Solomon. He also turned over transcripts of an interview with two friends of defendant, Nora Sandoval and Eric Strong. The prosecutor used the transcripts to cross-examine defendant and Drs. Solomon and Benson. Defendant now contends that counsel was ineffective both in turning over the transcripts of the first and third interviews and in failing to object to the use of the transcripts on cross-examination of defendant. He also argues that the use of the Sandoval-Strong interviews was improper.

1. *Hypnosis Interview Transcripts.*

The portions of the transcripts which are pertinent to defendant's contentions relate (1) to his impression at the time of the first interview that unfavorable material would be destroyed, and (2) to the discussion during the third interview of his doubts about the projected diminished capacity

---

[11.]Defendant also argues that he had a due process right to introduce the videotapes because they are evidence material to his defense. However, a defendant has no right "to present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using Evidence Code section 352." (*People* v. *Reeder* (1978) 82 Cal.App.3d 543, 553 [147 Cal.Rptr. 275]; accord *People* v. *Northrop* (1982) 132 Cal.App.3d 1027, 1042 [182 Cal.Rptr. 197].) As noted, the tapes were cumulative and their significance in establishing the basis for the doctor's opinions was marginal at best.

defense. During the first interview, in what appears to have been an effort to calm defendant's suspicions about the presence of a police officer in the room, Dr. Solomon told defendant that defense counsel had stated that material unrelated to his defense would be destroyed. During the third interview, defendant and the doctor discussed defendant's doubts about the diminished capacity defense. Defendant expressed his preference for an alternate explanation for his amnesia. He felt it made more sense to hypothesize that someone had entered the store and knocked him unconscious before killing Street.

Defendant argues that the work-product doctrine covered Solomon's statement regarding the destruction of material unrelated to his defense and the attorney-client privilege covered the statements defendant made during the third interview regarding his doubts about the psychiatric defense. He claims that the disclosure of the transcripts, coupled with the cross-examination thereon "effectively withdrew the very defense [counsel] was presenting," because it permitted the prosecutor to suggest that the defense was contrived.

Defendant cites *People* v. *Collie* (1981) 30 Cal.3d 43 [634 P.2d 534, 23 A.L.R.4th 776]. *Collie* dealt with prosecutorial discovery—*compelled* production of defense evidence—and is not controlling here. Defendant nevertheless argues that counsel was ineffective under that case for *voluntarily* disclosing documents which he allegedly was under no obligation to disclose to the prosecution.

As noted previously, a claim of ineffective assistance of counsel will not be reviewed on appeal absent a record from which it may be ascertained that there is no reasonable tactical explanation for an attorney's alleged failure to perform in a manner to be expected of a reasonably competent attorney. (*Pope, supra,* 23 Cal.3d at p. 425.)

■ Section 721, subdivision (a) of the Evidence Code provides that an expert witness "may be fully cross-examined as to . . . (3) the matter upon which his opinion is based and the reasons for his opinion." Once the defendant calls an expert to the stand, the expert loses his status as a consulting agent of the attorney, and neither the attorney-client privilege nor the work-product doctrine applies to matters relied on or considered in the formation of his opinion. (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) §§ 29.8 at p. 1035, 35.6 at p. 1333; accord *People* v. *Whitmore* (1967) 251 Cal.App.2d 359, 366 [59 Cal.Rptr. 411]; see also *People* v. *Modesto* (1963) 59 Cal.2d 722, 732 [31 Cal.Rptr. 225, 382 P.2d 33].)

Defendant concedes that *Collie, supra,* 30 Cal.3d 43, does not apply to such matters. Nevertheless, he argues that the psychiatrists did not rely on

the first and third transcripts in forming their opinions of defendant's psychiatric status. The record belies that argument. Dr. Solomon stated that it was after the *first* session that he formed his opinion that defendant had suffered a dissociative reaction. He also stated that the third session—during which, it will be remembered, he was unable to hypnotize defendant—enhanced his belief that defendant *was* hypnotized during the first two sessions. There is nothing in the record to suggest that Dr. Benson did not similarly rely on the third and first interviews. As far as we can ascertain from the record, counsel's disclosure of the interview transcripts was beyond reproach.

■ The claim that counsel was ineffective in failing to object to the use of the statements on cross-examination of defendant is equally without merit. As we stated in *People* v. *Harris* (1981) 28 Cal.3d 935, 953 [171 Cal.Rptr. 679, 623 P.2d 240], when "a defendant voluntarily testifies in his own defense the People may 'fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.'"

The use of the statements contained in the first and third interview was permissible as an inquiry into the facts and circumstances surrounding defendant's assertion that he was amnesic regarding the events that led to Street's death. It was also permissible as an inquiry into the overall viability of his dissociative reaction defense. Counsel's failure to object was therefore perfectly reasonable. Most competent attorneys would prefer not to run the risk of magnifying the significance of such an inquiry by attacking it with a futile objection.

We conclude that defendant's claim that counsel was ineffective in failing to object to the use of the hypnosis transcripts must fail.

2. *Sandoval-Strong Interviews.*

The Sandoval-Strong interviews were used on the recross-examination of defendant. Those interviews contained statements regarding the frequency with which Sandoval and Strong had seen defendant with a knife or gloves. They also contained statements regarding defendant's financial state, personality, and mood at the time of the offense. Defendant concedes that the statements could be used to attack his credibility (Evid. Code, § 780). He claims, however, that the statements made by his friends Sandoval and Strong were admitted during the testimony of Dr. Benson for the *limited purpose* of showing the bases of the defense expert's testimony and should

not have been used to cross-examine defendant about the truth of his testimony.

The prosecution called defendant to the stand for rebuttal after the defense rested. The court indicated that the recross-examination would be limited to matters brought out since defendant's previous testimony. Our review of the record reveals that the court carefully limited the questioning to matters that were in contradiction of defendant's own prior testimony. Significantly, defense counsel interposed no objection to the questions directed to defendant by the prosecution and thereafter conducted a redirect examination to mitigate any adverse consequences of the prosecution's questioning.

■ The general rule is that "questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].)

Defendant made no objection that the prosecutor exceeded the permissible scope of statutorily authorized credibility cross-examination. We therefore decline to consider the argument that the use of the Sandoval-Strong interviews on defendant's recross-examination was improper.

D. *Prosecutorial Misconduct.*

Defendant claims that the prosecutor engaged in misconduct in his closing argument. It is argued that, by weaving together various pieces of evidence developed without objection during the examination of defense witnesses, the prosecutor insinuated or suggested that defense counsel and the psychiatrists had assisted defendant in fabricating the diminished capacity defense.

The prosecutor's closing argument was interspersed with the following comments: Discussing the possibility that a third person was at the scene, "Now, it may be plausible, if you want to believe what I consider rather self-serving testimony of the defense psychologist and the psychiatric social worker . . . that Mr. Milner is such a nice boy, he wouldn't have committed this crime." Referring to defendant's mental state, "Here we have defense-trained psychologists and psychiatrists looking to find out what's wrong with Mr. Milner. There's got to be some explanation for his amnesia. . . . And we had Dr. Solomon come in and testify, . . . and also elucidated by Dr. Solomon's testimony was the fact that Mr. Milner didn't claim any mental disease or defect. His attorney apparently wanted him to

go see the doctors, so he [defendant] felt there was nothing wrong with him and you have to consider that when you consider the statements made by Mr. Milner during the course of the hypnotic interviews." About psychiatrists he said, "All right. Now, we have what the psychiatrists have to do on the part of the defense because they're looking for a defense; they're the people of last resort. There is no way else to explain it. Okay. So they're looking for something. Well, look, he can't be on the normal side; he has to be on the abnormal side because you need a mental disease or defect for diminished capacity to fly in court. To introduce the mental state, so he can't formulate the intent, the specific intent, to steal. . . . So you have these psychiatrists. He's got amnesia. They know what's happening. They've testified in criminal cases. They know the relation of the thrust in criminal defenses. We have got to explain this somehow. Milner's got to have a defense." Regarding defendant, the prosecutor stated, "What do you do. You look for another out, and that's what Milner did in this case, because you have the psychiatrists for the defense, and they go in there. Mr. Milner, you had amnesia. It's not their job to question him, to blow holes in his story. It's their job to bolster his story."

Shortly thereafter, during a recess called because of the length of the argument, the court cautioned the prosecutor about the potential problem in his references to defense counsel and contrived defense.[12]

### 1. *Failure to Object/Effectiveness of Counsel.*

The People deny that misconduct is revealed by the quoted record and claim, furthermore, that any error by the prosecutor was waived by failure to object. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d

---

[12]The court addressed the prosecutor: "You said something that troubled me. You said he's got a lawyer, and then you started talking about his contriving a defense in the main case. As you know, . . . [that] is one of the things you cannot imply to a jury, that a lawyer is helping contrive a defense.

"[Prosecutor:] I'm not saying that.

"Court: But that's an inference someone can draw from the statement, he's sitting in jail; he's thinking; he's got a lawyer. That could be—one could take that to mean the lawyer helped him with his story. You can't make that implication.

"[Prosecutor:] I'll make that clear. I wouldn't do that.

"Court: I know that. I find it under my perimeter of Chapman doubt that there is no danger here that that happened. I don't think the jury understood you to mean another, but it's a possibility, could be made, just like Griffin error. You can't do it, direct or by implication.

"[Prosecutor:] I'll clear that up. . . . [Defense counsel] acted, other than tactical decision, with complete honesty. I'll clear it up.

"[Defense counsel:] In that respect, it may be difficult to clear it up. It may deepen the hole—

"Court: I would not recommend you try to clear it up. That may even carry a greater suggestion. All I'm trying to do is caution you not to do it again. I do find, beyond a doubt, that if it was error or misconduct, it was not harmful in this case. . . ."

468].) Defendant counters that, inasmuch as the court sua sponte raised the issue of the impropriety of suggesting that defense counsel fabricated a defense, any failure to object was cured—that is, the court had an opportunity to correct the misconduct and failed to do so.

Even if we concluded that the contemporaneous objection requirement is satisfied here, defendant's claim would fail. ■ Prosecutorial misconduct is cause for reversal only when it is "reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant." (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].) The prosecutor's comment contained no more than a hint that the defense was fabricated with the assistance of counsel. The trial court, with firsthand knowledge of the circumstances under which the comment was made, expressly found that "if it was error or misconduct, it was not harmful in this case." We agree with that assessment.

■ Defendant also urges that counsel was ineffective in failing to object to the purported misconduct. In our view, the statements complained of fall within the realm of legitimate inference drawn from the evidence; the prosecutor may state to the jury the various conclusions that he draws from the evidence and may suggest what conclusions, in his opinion, should be drawn from the evidence introduced. (*Beivelman, supra,* 70 Cal.2d at p. 76.)

Even if one or more of the statements were improper, none of them took up more than a few lines of the prosecutor's lengthy closing argument. Defense counsel would therefore have been well within the bounds of reasonable competence had he chosen to ignore the statements rather than draw attention to them with an objection. (See *People* v. *Fosselman, supra,* 33 Cal.3d at p. 582; *People* v. *Pope, supra,* 23 Cal.3d at pp. 425-426.) Indeed, there is some indication (see *ante,* p. 244, fn. 12) that counsel here made that tactical choice.

### 2. *Fair Trial and Due Process.*

■ Defendant also raises the novel argument that he was denied a fair trial and due process of law by the prosecutor's "exploitation" of his expressed reservations about his diminished capacity defense. The exploitation allegedly occurred (1) when the prosecutor cross-examined defense witnesses about defendant's reluctance to pursue the mental defense and (2) during closing argument. It is unfair, urges defendant, to bind a defendant to his attorney's choice of defense and then to make reference to defendant's disagreement with the choice.

Defendant claims that our decision in *People* v. *Frierson* (1985) 39 Cal.3d 803 [218 Cal.Rptr. 73, 705 P.2d 396] (*Frierson II*) lends support, at least indirectly, to his claim of prejudice. In *Frierson II* we held that a defense counsel's traditional power to control the conduct of a case does not include the authority to withhold the presentation of any defense at the guilt/special circumstance stage of a capital case when the defendant openly expresses a desire to present a defense at that stage and when there exists credible evidence to support that defense. In that case the diminished capacity defense that Frierson wanted to present was the sole defense to the special circumstance allegation.

The differences between *Frierson II, supra,* 39 Cal.3d 803, and the instant case are manifest and no purpose is served by detailed analysis. Suffice it to say that defendant's alleged disagreement with counsel was but casual comment regarding his feelings about exploring the mental defense. Defendant never expressly disapproved the defense and conceded that counsel, in a case such as this, would be led to present a mental defense. Nevertheless, defendant continues to argue that it was "unfair" of the prosecutor to cross-examine him about his views relating to his mental state. As the court noted, *with agreement of defense counsel,* "You as a prosecutor do not have to accept the claim of amnesia, you may assume for purposes of your cross that he's malingering and as such would be a guilty state of mind and you're entitled to expose that to the extent that you can through cross-examination."

In sum, we reject all of defendant's contentions regarding alleged prosecutorial misconduct.

E. *Admissibility of Evidence.*

Defendant's final contention at the guilt phase is that, on four separate occasions, the court erred in admitting evidence. We conclude hereafter that, while some of the court's evidentiary rulings may have been questionable, none warrants reversal.

1. *Photographs*

Defendant challenges the admission of three photographs of the victim. Defense counsel had interposed a relevancy objection and also objected on Evidence Code section 352 grounds. We perceive no abuse of discretion in their admission.

One of the photos is a close-up of Street's legs stretching from the fallen clothes rack. It discloses blood on both pant legs. The others are full-length

photographs of the victim positioned as Reese discovered him. One is taken from the rear hallway and shows defendant's jacket on the floor, the knife sheath, and Street's body as it appeared from that angle. The other is of Street's body from a different angle.

■ Defendant first argues that the photos were irrelevant because intent to kill was not in issue. On the contrary, the jury was instructed, and the prosecutor argued, on alternate theories of premeditated and deliberate murder and felony murder. (See *People* v. *Jackson* (1980) 28 Cal.3d 264, 302-303 [168 Cal.Rptr. 603, 618 P.2d 149] [photograph of murder victim relevant to issue of defendant's state of mind toward victim when jury instructed on alternative theories of premeditated murder and felony murder]; cf. *People* v. *Turner* (1984) 37 Cal.3d 302, 320-321 [208 Cal.Rptr. 196, 690 P.2d 669] [prosecution case based solely on felony murder].)

■ Defendant also argues that the photographs were cumulative because the autopsy physician and Officer Reese were allowed to testify fully as to the location and condition of the body. The photographs in this case were not cumulative, but *corroborative*. (See *People* v. *Murphy* (1972) 8 Cal.3d 349, 364-365 [105 Cal.Rptr. 138, 503 P.2d 594].) They helped to clarify the testimony of Officer Reese regarding the precise location of the body and various other items related to the commission of the crime. Moreover, as the prosecutor noted, the only aggravating circumstance properly available to the People in this case was the manner of the commission of the crime. ■ "Photographs which disclose the manner in which a victim was wounded are 'relevant on the issues of malice [citations] *and aggravation of the crime and the penalty* [citations].'" (*People* v. *Frierson* (1979) 25 Cal.3d 142, 171 [158 Cal.Rptr. 281, 599 P.2d 587]; accord *People* v. *Montiel* (1985) 39 Cal.3d 910, 924 [218 Cal.Rptr. 572, 705 P.2d 1248] [admitting photographs relevant to demonstrate the physical scene of the crime].)

And finally, the photographs were not unduly gruesome, certainly not gruesome enough to warrant a determination that their substantial probative value was outweighed by their prejudicial effect. The court did not abuse its discretion in admitting them.

### 2. *Jack Berard's Testimony.*

Jack Berard, an assistant manager at Gamble's, was called by the prosecution and asked whether Street had ever expressed any feelings about defendant. On objection of defense counsel, the prosecutor made an offer of proof, stating that Berard would testify that Street had expressed some suspicion that defendant was pilfering from the store. The testimony was offered to rebut what the prosecutor expected would be Officer Myers'

testimony that defendant told him he had no reason to fight with Street because Street was going to give him a job as a salesperson. The trial judge refused to allow Berard to testify regarding Street's suspicions because, "if it goes in now, the jury will think it goes to the defendant's propensity to commit crimes."

Subsequently, the prosecution called Officer Myers to the stand. He testified that defendant stated "that he did not remember stabbing Charles Street, that he had no reason to stab Charlie because Charlie was going to give him a job." Thereupon, over defense objection, the court admitted the testimony regarding Street's suspicion on the ground it could be used to impeach the defendant's statement to Officer Myers.

The jury was admonished that the testimony it was about to hear was not to be "considered as evidence for the truth of the declarations allegedly imputed to the deceased Charles Street [but only] to show his state of mind so the jury might decide for themselves what actions Mr. Street did or would or would not have taken with that state of mind." The judge asked defense counsel if he was satisfied with the limiting instruction; counsel replied affirmatively.

Berard testified that Street had stated that, although he could not pinpoint the reason for his suspicions, he suspected defendant of being responsible for certain shortages at the store. Berard also stated that Street told him that he did not like the way defendant had left his employment at Gamble's and that he [Street] had a general distrust of Black people. Berard could not, however, recall Street ever having expressed an open dislike for defendant in particular.

At the close of Berard's testimony regarding Street's state of mind vis-à-vis defendant, the judge once again admonished the jury that "all this part of the evidence of this witness has been limited to state of mind of the deceased, Charles Street, and not for the truth of the matter and his state of mind is material and relevant because it bears on how the jury will decide whether the statements made by the defendant to the police were truthful or not truthful statements. . . ."

Defendant complains that the admission of the testimony was error on several grounds. ▮▮▮ First, he claims that the statements were untrustworthy and only marginally probative and inadmissible under Evidence Code section 1252 which provides, "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness." However, statements made in a natural manner, with no incentive to be untruthful, carry a sufficient probability of

trustworthiness to escape the bar of section 1252. (*People* v. *Spencer* (1969) 71 Cal.2d 933, 947 [80 Cal.Rptr. 99, 458 P.2d 43]; *People* v. *Hamilton* (1961) 55 Cal.2d 881, 895 [13 Cal.Rptr. 649, 362 P.2d 473] [overruled on other grounds in *People* v. *Wilson* (1969) 1 Cal.3d 431, 442 [82 Cal.Rptr. 494, 462 P.2d 22]].) In this case, the statements were made in a natural manner, and defendant has pointed to no motive that Street might have had to lie when he made them.

 Second, defendant urges that there was substantial danger that the jury would take Street's statements regarding his suspicions as statements of fact despite the limiting instructions. In *People* v. *Hamilton, supra,* 55 Cal.2d 881, upon which defendant relies, the state of mind in issue was the murder victim's alleged fear of the defendant, her former husband. Her declarations that she feared him because of threats and beatings were presented to the jury. Most of her declarations referred to past acts of the defendant.

The *Hamilton* court stated that it was impossible to effectively limit the prejudicial effect of the testimony because the alleged fear could only reasonably exist because of the conduct of husband, not because of his threats, and "it must be inferred that the declarant had this mental state of fear only because of the truthfulness of the statements contained in the assertion." (55 Cal.2d at p. 896.) The court added that even an expert would have had difficulty adhering to the limiting instruction.

In the case at bar, the statements do not refer to past acts of the defendant but to the suspicions and prejudices of the victim. There was no suggestion that defendant had actually committed the act of pilfering of which Street suspected him. Street's mistrust of defendant—his state of mind— could reasonably exist without having any basis in reality. The other statements referred to regarding Street's mistrust of Blacks in general and his resentment of defendant for having left his job only served to reinforce the questionable nature of Street's suspicions. At the same time, however, they reinforced the improbability of defendant's assertion that Street offered him a job.

Unlike in *Hamilton, supra,* 55 Cal.2d 881, here no mental gymnastics were required for the jury to comply with the limiting instruction. We are unpersuaded that there was a substantial danger that the jury failed to do so.

Finally, defendant asserts that the trial court failed to make an express finding on the Evidence Code section 352 objection before admitting the evidence. He cites *People* v. *Green, supra,* 27 Cal.3d 1, in which we held that

the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value. While the court did not expressly invoke the code section when ruling on the admissibility of the statements, the record in this case makes clear that the judge gave ample consideration to defense arguments against the admission of Berard's statements. We find no *Green* error.

### 3. *Bloodstained Pants.*

█ Defendant contends that the trial court erred in "sua sponte" requiring him to don bloodstained pants for a demonstration in the courtroom and in failing to make a probative/prejudicial determination (Evid. Code, § 352) before making the ruling, as required by *People* v. *Green, supra,* 27 Cal.3d 1. The contention is without merit.

During cross-examination the prosecutor asked defendant to hold, waist high, the pants he had worn on the night of the murder and to demonstrate how the knife was situated in the pocket. The pants were still discolored by the victim's blood. Defendant complied. The prosecutor then asked defendant to further demonstrate how the knife fell out of the pocket. Defense counsel's objections to the demonstration were overruled. Defense counsel then stated, "Perhaps we could have Mr. defendant put the pants on if we want an appropriate demonstration."

The court excused the jury and a somewhat acrimonious exchange followed. The judge stated, "[t]he prosecution must have latitude . . . to put the defendant's testimony and alleged conduct into perspective. . . . [t]o ask [the defendant] to demonstrate how and explain how that knife came out is entirely appropriate but I think you're right in asking that he put on the pants if that's what you wish. I could have seen an objection to having to put on bloody pants. Since you've asked for it we'll accommodate you."

Defense counsel repeated that he felt that "the demonstration was not an appropriate one in that the pants were not on," but objected that the pants were inflammatory and could possibly prejudice the jury. The court overruled the objection, stating, "The evidence in this case is by its very nature inflammatory. . . ." Defendant returned with the pants on and demonstrated how, while putting on his gloves, he had dropped his keys, bent over to pick them up and, when the knife had begun to fall from his pants pocket, taken the knife out of the pocket and readjusted it.

As is evident from the above excerpts from the record, the trial judge did not "sua sponte" order the defendant to perform the demonstration wearing the pants. Rather, he took defense counsel at his word and agreed that the

demonstration would be more accurate if defendant performed it with the pants on. The court considered counsel's objection and decided that, given the bloody nature of the killing and the consequent fact that all the evidence in the case was somewhat inflammatory, the prejudicial value of the sight of the pants on the defendant did not outweigh the probative value of having the defendant demonstrate his version of what happened on the night of the murder. We read *Green, supra,* 27 Cal.3d 1 to require no more.

4. *Prior Conduct to Impeach.*

On direct examination, defendant testified that he had been arrested once before. Defense counsel asked him to explain what had happened on that occasion and defendant stated that he had mistakenly been arrested for an auto theft. The district attorney pursued the matter further on cross-examination, and it was revealed that defendant and his friend Eric Strong had borrowed a car to drive to Los Angeles and the car had turned out to be stolen.

The prosecutor then explored whether defendant had ever been involved in petty thievery. Defendant stated that he had done some things as a youngster that *he* would consider thievery—for example, he once took some money from a bank into which his parents had put change for him and on another occasion he took a package of Kool-Aid from a supermarket.

The court excused the jury after cross-examination and noted, "[o]ut of an abundance of caution, I think the record should show that at the time the district attorney commenced his cross-examination about . . . the alleged stolen automobile and about prior acts of thievery, I looked at the defense counsel rather pointedly to see if there was an objection. . . . [I]f there had been objection I would have sustained the objection but I probably would have struck the direct examination on that subject." Counsel did not request any kind of admonishment of the jury even after the judge's soliloquy.

Defendant now complains that the trial judge should, sua sponte, have instructed the jury to disregard the "prior conduct" evidence. We rejected a similar argument in the context of prior criminal offenses in *People* v. *Collie, supra,* 30 Cal.3d 43, 64: "Neither precedent nor policy favors a rule that would saddle the trial court with the duty either to interrupt the testimony *sua sponte* to admonish the jury whenever a witness implicates the defendant in another offense, or to review the entire record at trial's end in search of such testimony. There may be an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant

to any legitimate purpose. . . . But we hold that in this case, and in general, the trial court is under no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct."

We believe that the holding in *Collie, supra,* 30 Cal.3d 43, is equally applicable to this case which concerns past bad acts as opposed to prior criminal offenses. Moreover, as the trial judge stated, "beyond a peradventure of a doubt . . . what little was brought out was harmless."

## III. SPECIAL CIRCUMSTANCE ALLEGATION

Trial counsel requested and was denied an instruction that, in order to find the special circumstance true, the jury had also to find that the robber intended to kill. On appeal, it is urged that failure to so instruct requires overturning the special circumstance finding. (See *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].) In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], we reconsidered our *Carlos* decision in light of intervening authority from the United States Supreme Court. ▇▇ We concluded that the court need not instruct on intent to kill as an element of the felony-murder special circumstance unless there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer. (*Id.* at pp. 1138-1139.)

There is *no* evidence in the record that points to another person as the possible perpetrator of the homicide. Defendant testified that, as he and Street were leaving the store, he felt a tremendous pain in the back of his head and later concluded that someone had hit him on the head from behind and then killed Street. Defendant did not deny that he killed Street and robbed the store; his sole defense was his mental incapacity to form the requisite legal intent to commit the felony murder.

Despite the lack of any evidence that defendant had an accomplice, the prosecutor speculated during oral argument at the guilt phase that defendant may have planned the robbery with another person and that the other person may have accompanied defendant to Gamble's parking lot.[13]

---

[13] The speculation undoubtedly derived from the mysterious circumstance, never explained at trial, that a set of keys to defendant's borrowed car was found on or behind the front tire of the car in the parking lot. It is also significant that the prosecutor was attempting to counter defendant's testimony that he came to Gamble's to seek a job, not to steal.

Further, it was the prosecutor who pushed for instruction on the liability of an aider and abettor in a situation where the instruction was seemingly inappropriate.[14]

In sum, we conclude that, absent any evidence that defendant aided or abetted another in the perpetration of the crimes, the aiding and abetting instructions were unnecessary to the case. Further, we find the record establishes beyond doubt that defendant was the actual killer in this case, and hence the finding required by *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368] is satisfied. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 390-391 [88 L.Ed.2d 704, 719-720, 106 S.Ct. 689, 699-700].)

## IV. PENALTY PHASE ISSUES

No additional evidence was introduced at the penalty phase. Pursuant to stipulation of the parties, however, the court instructed the jury that it could consider the testimony of the psychiatric experts regarding the defendant's character and background for all purposes during the penalty deliberations. The jury had previously been limited to consideration of the evidence only as the basis of the experts' opinions.

■ Defendant assigns a number of errors at the penalty phase. We discuss only the contention that the prosecutor, in closing argument, misled the jurors as to their responsibility in the sentencing phase. We agree and reverse under compulsion of *Caldwell* v. *Mississippi, supra,* 472 U.S. 320, and *People* v. *Brown, supra,* 40 Cal.3d 512.

The United States Supreme Court has recently underscored the constitutionally required recognition by each juror of the enormity of the responsibility involved in the life and death determination that must be made in a capital case. In *Caldwell* v. *Mississippi, supra,* 472 U.S. at pages 328-329 [86 L.Ed.2d at pp. 239-240], the court said: "[I]t is constitutionally impermissi-

---

[14] For example, during the discussion of penalty phase instructions, the court suggested that the paragraph in CALJIC No. 8.84 relating to the liability of an aider and abettor who did not kill was inapplicable on the facts of this case. The prosecutor wanted it given "in an abundance of caution . . . I don't think it will hurt one way or another." Defense counsel, after noting that he had addressed the matter at oral argument only because the prosecutor had done so, stated: "but when you get right down to it, there just isn't evidence of that. There is nothing in the case that indicated anyone else was involved in this situation, and it's cumulative. I think it's covered in the rest of the instruction." Because the prosecutor was "adamant . . . I want to include every instruction that is even remotely possible . . . to forestall the possibility of error," the court finally agreed to include the aider and abettor paragraph.

ble to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. . . . In evaluating the various procedures developed by States to determine the appropriateness of death, this Court's Eighth Amendment jurisprudence has taken as a given that capital sentencers would view their task as the serious one of determining whether a specific human being should die at the hands of the State. . . . Belief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an 'awesome responsibility' has allowed this Court to view sentencer discretion as consistent with—and indeed as indispensable to—the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.' "[15]

The prosecutor in *Caldwell* would have shifted the responsibility for the jury's decision as to the appropriate penalty to the appellate courts; he sought to minimize the jury's sense of the importance of its role by telling the jury that its determination of whether death was the "appropriate" penalty would be reviewed for correctness by the state Supreme Court. (472 U.S. at pp. 325-326, 336 [86 L.Ed.2d at pp. 237, 244.) In the instant case, the prosecutor did not so much shift the jury's responsibility as negate its existence.

The prosecutor commenced his closing argument with a cautionary note: "Now, you're dealing with the issue of death or life imprisonment. And in that respect you, as individuals, may think it's your duty or may let your personal feelings become involved in this case . . . if you try to do, what is in your own mind, justice or try to impose what is, in your own mind, truth, in this particular case, you're taking upon your shoulders a burden that the law does not require, a burden that is personal to you . . . I submit to you you're not to do or arrive at what you, as individuals, feel is just or true in this particular case, based upon your own standards, because if you do so, you're taking upon each one of you individually a burden that the law does not require."

---

[15] The uniqueness of the jury's role in capital cases was also emphasized in *Caldwell* when, in response to a dissenter's comment that the thrust of the prosecutor's argument still left the jury with an understanding that it had an important role to play in the sentencing process, the majority noted, "As we have discussed, in one crucial sphere of a system of capital punishment, the capital sentencer comes very near to being 'solely responsible for [the defendant's] sentence,' . . . and that is when it makes the often highly subjective, 'unique, individualized judgment regarding the punishment that a particular person deserves.' *Zant* v. *Stephens,* 462 U.S. 862, 900 (1983)." (472 U.S. at p. 340, fn. 7 [86 L.Ed.2d at pp. 246-247].)

The prosecutor reminded the jurors of the oath they had taken to follow the law and told them that the Legislature had set out certain factors to be applied: ". . . if you get away from these factors and interpose your own personal feelings or prejudices concerning this, you are truly stepping outside of the law and taking personal responsibility for your decision. The law does not require that. The law requires you to balance certain factors before you arrive at your ultimate decision. . . . I'll read for you the paragraph, the law which you have sworn to follow. The law that protects you, as individuals, from the weight of your individual prejudices or feelings, personal feelings, in the case. The law states, if you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death."

Thereafter, referring again to "the law that protects you," the prosecutor reviewed the mitigating and aggravating factors, himself counting as an aggravating circumstance every potentially mitigating factor except those of age and prior convictions.

When the prosecutor concluded his review of the factors, he correctly noted that "these are the factors that you're going to have to weigh, and in each category, you should probably, as a jury, decide how important each of the factors is in your ultimate decision." He added, however, "This gives you a chance, as jurors, to interject your own personal feelings. But when you interject your own personal feelings, when you get to that stage, then I submit to you you're stepping outside of the protection of the law and taking upon your shoulders a weight that you, as jurors, are not required under the law to shoulder in this particular case." He concluded: "When you add up the circumstances in this case, there is no other conclusion that you can come to, if you stick within the protection of the law, something that protects you and you. . . . The only proper decision for you to make is that Mr. Milner should be put to death."

Referring to the upcoming defense argument, the prosecutor stated: "sometimes it's argued . . . in order to inflame you, to impose upon you, the responsibility, the ultimate responsibility, in saying each one of you is going to kill my client; you have to vote to kill my client. That's not the issue. You are, as jurors, to apply these factors, that's your duty. . . . All juries facing the same set of facts, would come up with the same decision, and this law, hiding under the veil of that law, will protect you from shouldering the weight of your decision, because if you step outside of that, you are definitely shouldering the responsibility." The prosecutor again told

the jury to consider the factors and "make *not* the verdict that you individually feel is just or right." (Italics added.)

Although defense counsel did a masterful job of countering the prosecutor's improper argument that absence of a mitigating factor rendered it an aggravating factor, he did little to rebut the misleading statements regarding the jurors' individual responsibility in deciding the appropriate penalty. Defense counsel briefly referred to the prosecutor and his argument: "He asked you to hide behind this law, and I'm not asking you to hide. And I don't think any of you should hide behind the law. You people are the perpetrators of the law. You never hide behind any of our laws."

The jury was instructed on its sentencing responsibility in accordance with section 190.3 (former CALJIC No. 8.84.2): "After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the aggravating circumstances do not outweigh the mitigating circumstances, you shall impose a sentence of confinement in the state prison for life without possibility of parole."

In *People* v. *Brown, supra,* 40 Cal.3d 512 (revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]) we reviewed *Caldwell, supra,* 472 U.S. 320, and other United States Supreme Court decisions. We concluded that the CALJIC No. 8.84.2 instruction given here, in isolation, had the potential for misleading the jury about the fundamental scope of its sentencing discretion. Our concerns were twofold and interrelated: that a juror might understand his function as (i) merely the "counting" of factors and then (ii) reaching an "automatic" decision, with no exercise of personal responsibility for deciding, by his own standards, which penalty was appropriate. (40 Cal.3d at pp. 538-545.) Similar to our decision in *Brown, supra,* 40 Cal.3d 512, other state high courts have interpreted *Caldwell, supra,* 472 U.S. 320, as requiring that the jury understand its responsibility to determine the sentence appropriate for a given defendant.[16]

---

[16] E.g., *State* v. *Ramseur* (N.J. 1987) 524 A.2d 188, 286-287 [524 A.2d 188] (court's instructions failed to convey to jury its responsibility for determining appropriateness of penalty); *Com.* v. *Baker* (Pa. 1986) 511 A.2d 777, 787-790 [511 A.2d 777] (prosecutor's argument diminished jury's responsibility for determining appropriateness of penalty); see also *Whalen* v. *State* (Del. 1985) 492 A.2d 552, 559-562 (court's instructions failed to convey to jury its

We believe the prosecutor's argument in this case left the jury "with the impression that its responsibility was merely to weigh aggravating and mitigating factors without regard to its view of the appropriateness of the alternative penalties, and that it was 'required' to return a sentence of death if 'aggravation outweighed mitigation' without, or even despite, each juror's *personal* conclusion from the evidence, about whether a sentence of death was appropriate under the circumstances for the offense and offender." (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1278 [232 Cal.Rptr. 849, 729 P.2d 115], italics in original.)

The prosecutor assured the jurors again and again that they did not have to "shoulder the burden of personal responsibility," told them again and again that the law "protects" them from deciding what is "just and right," and even encouraged them to "hide" behind the law. The attempt by defense counsel to ameliorate the harm was too insubstantial to have any effect. Although he told the jurors *not* to hide behind the law, he did not teach them about the full extent of their discretion. In essence the jurors were told that the "awesome responsibility" for the life and death determination did not rest with them.

Here, as in *Caldwell,* "the prosecutor's argument sought to give the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.' *Woodson* v. *North Carolina,* 428 U.S. at 305." (472 U.S. at p. 340 [86 L.Ed.2d at p. 246].) Here, as in *Caldwell,* the prosecutor's argument, left uncorrected, so affected "the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment." (*Ibid.* [86 L.Ed.2d at p. 246].)

We do not reach our conclusion based on any single statement uttered by the prosecutor. Rather, we consider the instructions of the court and the arguments of both prosecutor and defense counsel. (*Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) Evaluating the whole record, we conclude that the jury in this case was misled as to its discretion and its responsibility in reaching its sentencing verdict and that reversal is therefore mandated. (*Caldwell, supra,*

responsibility to determine the appropriate penalty in the context of its weighing of aggravating and mitigating factors); *People* v. *Durre* (Colo. 1984) 690 P.2d 165, 169-175 (court's instructions failed to clarify that the jury was to determine unanimously the appropriate penalty; instructions in future cases should make this clear).

472 U.S. at pp. 340-341 [86 L.Ed.2d at pp. 246-247]; *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)

We reverse the judgment of death. In all other respects the judgment is affirmed.

Lucas, C. J., Mosk, J., Broussard, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

Appellant's petition for a rehearing was denied June 30, 1988.