Filed 6/19/14  P. v. Wightman CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>     v.<br><br>NICOLE LINDSAY WIGHTMAN,<br><br>   Defendant and Appellant. | G048154<br><br>(Super. Ct. No. 12WF2710)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Deputy Attorney General, for Plaintiff and Respondent.

\*        \*        \*

Nicole Lindsay Wightman and her husband were convicted for assault with force likely to produce great bodily injury.[1] The victim was a former boyfriend of defendant's. Defendant argues there was insufficient evidence to convict her on an aiding and abetting theory. We disagree, concluding the totality of the evidence supports a very reasonable inference that the attack on the victim was preplanned. Defendant also argues numerous instances of prosecutorial misconduct so infected the trial with error that reversal is required. We do find, agreeing with the trial court, that two discovery violations did constitute misconduct. When considered in context, however, appropriate jury instructions were sufficient remedies. The remainder of defendant's claims of prosecutorial misconduct are without merit. We therefore affirm.

I

FACTS

In October 2012, defendant Nicole Wightman and two codefendants, Joseph Romero and Rogelio Izaguirre, were charged with one count of attempted second degree robbery (Pen. Code,[2] § 664, subd. (a), § 211, § 212.5, subd. (c), count one) and one count of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4), count two), based on the following facts.

Brandon Cordeiro, the victim, testified that on October 10, 2012, he made arrangements via text message to meet defendant at Kohl's department store in Cypress. Defendant was living in Lake Elsinore at the time. Cordeiro and defendant had dated during high school, but had stopped dating a few years earlier and were not on good terms. Cordeiro moved to Nevada. After he left, defendant's mother sent him a cell phone he could use to keep in touch. According to Cordeiro, he returned it to her

---

[1] A friend of theirs, Rogelio Izaguiree, was present during the incident and also charged with this offense. He was granted a mistrial on this count.

[2] Subsequent statutory references are to the Penal Code.

2

approximately six months later, but defendant did not believe he had ever returned the phone.

When defendant learned Cordeiro was back in the area, she contacted him. Cordeiro thought they were meeting to catch up. While they were texting about meeting, defendant told Cordeiro she was bringing a male friend with her.

Cordeiro was in the store shopping when defendant arrived with two men, later identified as her husband, Joseph Romero, and a friend of theirs, Izaguirre. Defendant walked over to Cordeiro alone. They hugged and talked for a short while. Romero then came over and defendant introduced him to Cordeiro. She introduced him as a friend, and did not tell Cordeiro they were married. Defendant handed Romero her cell phone and he walked away. Defendant asked Cordeiro to go outside and talk, and Cordeiro agreed. He did not keep track of where either Romero or Izaguirre was as he left the store with defendant.

They walked to Cordeiro's truck. He opened the driver's side door to retrieve a jacket, and left the door open. Surveillance video, without audio, captured a good portion of what happened next. Cordeiro later testified he and defendant were still making small talk. He told defendant he wanted to go to another store. A few minutes later, Romero arrived. According to Cordeiro, the tone of the conversation immediately changed from friendly to aggressive. Romero asked defendant if Cordeiro was the person who owed her a phone, and defendant said yes. In the video, Romero advances to within a few feet of Cordeiro, who is backed against the open door of the truck. Cordeiro said he had sent the phone back. Romero then asked Cordeiro what kind of phone he had, and tried to take Cordeiro's phone from his pocket. Defendant did not say anything; she was standing toward the rear of the truck and Cordeiro was not paying attention to her. He did see Izaguirre standing about five feet away, shouting something, but Cordeiro was not listening to him.

3

Cordeiro tried to get in his truck. He got into the driver's seat and tried to close the door, but Romero and Izaguirre prevented him from doing so. Cordeiro yelled, "Help, help, I'm being mugged, help." Romero and Izaguirre punched him repeatedly on the left side of his face and the back of his head. He did not know where defendant was or what she was doing, but she did not intervene. The video shows her walking away casually while the assault was ongoing.

Cordeiro eventually passed out for a short time, and when he woke up, he was alone. The video shows defendant, Romero and Izaguirre walking, and then running, toward a car a short distance away. When Cordeiro woke up, he was bleeding. He called 911, and the operator told him to meet the police in front of the Kohl's. He went to the hospital after speaking with police.

The reason that much of the assault was captured on surveillance video was that Romero and Izaguirre caught the attention of Jason Oregel, a loss prevention officer at Kohl's, when they first entered the store. Oregel was watching surveillance cameras on the night in question. He watched them as they moved about in the store, interacting with each other but not really looking at the products. They went back toward the exit and looked through the windows before leaving the store.

Once they exited, Oregel saw them separate and walk in the direction of the truck. Oregel saw a male and female (Cordeiro and defendant) already by the driver's side of the truck. Romero and Izaguirre stopped about eight feet away, looking at them, before approaching. Oregel then moved the camera away from the people and zoomed in to capture the truck's license plate. As he paused to write down the number, he saw that the license plate appeared to be shaking and moved the camera back. When he did so, he thought he saw one person by the open driver's side door "moving his upper body vigorously." As he continued to watch, he saw there was not one person, but both of the men he had seen leave the store were striking something.

After the car with defendant and her companions left, Oregel went outside. He saw Cordeiro had blood under his nose. Oregel stayed with Cordeiro until the police arrived and then burned a copy of the video to provide it to the police.

At trial, defendant did not testify, but her attorney later argued there was insufficient evidence of aiding and abetting. Romero did testify, and as relevant here, he said he and defendant had gone to meet Cordeiro so that she could have "some closure," because Cordeiro had cheated on her and been abusive. With regard to the incident at Cordeiro's truck, Romero testified when he asked Cordeiro about the phone, Cordeiro replied, "It's none of your f–ing business," which made Romero mad. He also thought Corderio might be under the influence of some substance. Romero said Cordeiro tried to hit him with the car door. In response, Romero set him down on the car seat. Romero testified he hit Cordeiro three or four times because he thought Cordeiro would otherwise try to hit him. He said it was Izaguirre who pulled him off Cordeiro, though he had previously told the police—before he was aware of the existence of the video of the incident—that it was defendant who pulled him away. He denied any plan on behalf of himself, defendant, and Izaguirre to harm Cordeiro.

At the conclusion of trial, the jury found defendant guilty of assault with force likely to cause great bodily injury, but acquitted her of the second degree robbery charge. The trial court suspended imposition of sentence and placed her on formal probation for three years, including 270 days in jail. The court also imposed victim restitution and standard fines and fees.

## II

## DISCUSSION

### A. Aiding and Abetting

Defendant first argues there was no substantial evidence that she was an aider and abettor in the assault on Cordeiro. When a defendant calls into question the sufficiency of the evidence, our review is a very limited one. ""When the sufficiency of

the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence— i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt."'  [Citations.]"  (*People v. Hill* (1998) 17 Cal.4th 800, 848-849.)  We presume the existence of every fact the trier of fact could have reasonably deduced from the evidence.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

Further, before we reverse a judgment for insufficiency of evidence, it must be clear there is no hypothesis under which we could find sufficient evidence.  (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)  "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.]"  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]"  (*People v. Maury* (2003) 30 Cal.4th 342, 403.)  This standard applies even "when the conviction rests primarily on circumstantial evidence. [Citation.]"  (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1053.)  We examine the evidence as a whole, in light of all the facts and their context.  (*Ibid.*)  "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.  [Citations.]'  [Citation.]"  (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

The jury was instructed with an appropriately tailored version of CALCRIM No. 875, regarding the elements of the assault charge under section 245, subdivision (a)(4):

"1A. The defendant did an act that by its nature would directly and probably result in the application of force to a person; and

"1B. The force used was likely to produce great bodily injury;

"2. The defendant did the act willfully;

"3. When defendant acted, he or she was aware of facts that would lead a reasonable person to realize that his or her act by its nature would directly and probably result in the application of force to someone;

"4. When defendant acted, he or she had the present ability to apply force likely to produce great bodily injury to a person; and

"5. The defendant did not act in self-defense or in defense of someone else."

A defendant who aids and abets a crime is equally liable as a principal offender. "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164; *People v. Beeman* (1984) 35 Cal.3d 547, 561.) "Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment. [Citations.]" (*People v. Mitchell* (1986) 183 Cal.App.3d 325, 329.)

"'[A]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

So the fundamental question here is whether there was sufficient evidence the assault on Cordeiro was the result of a plan as opposed to a spontaneous act. By

7

finding defendant guilty, the jury impliedly concluded the assault was planned. We agree there is sufficient evidence to support this conclusion.

The evidence demonstrated that defendant contacted Cordeiro, and despite living a considerable distance away, planned to meet with him at a place he would be shopping. On the way to Cypress, defendant and Romero picked up Izaguirre, who was described by Romero as a friend with whom they wanted to socialize. The jury, however, was free to put a different interpretation on the presence of another man there to support defendant and Romero, especially considering that defendant never mentioned Izaguirre to Cordeiro.

She did not tell Cordeiro that she was married, either ahead of time or when she introduced Romero in the store. Also not mentioned in the store was the issue of the supposedly unreturned cell phone. It was defendant who suggested they go outside, placing Cordeiro in a position where he would be more vulnerable than he would have been inside the store.

The video evidence shows that prior to Romero's approach, defendant and Cordeiro were behaving casually. He is putting on a jacket, and she is leaning against the bed of the truck. Once Romero approaches, defendant leans toward Cordeiro in a more aggressive manner, and Cordeiro's attitude is no longer relaxed or casual. When the assault occurs, defendant does nothing to intervene. She observes, then walks toward the back of the truck before running away with Romero and Izaguirre toward their car. Cordeiro never heard her yelling to stop, and nothing on the video indicates she attempted to stop the assault. Romero, before he learned of the video, lied and told the police that defendant tried to stop him. This does nothing to exculpate her, but instead suggests an intentional lie meant to relieve her of any responsibility, when in fact she was equally responsible.

Taken as a whole, it was more than reasonable for the jury to infer defendant was not a mere bystander, and her reliance on *People v. Hill* (1946) 77

8

Cal.App.2d 287, is therefore completely unpersuasive.  Indeed, from the totality of the facts a reasonable jury could fairly infer the attack on Cordeiro was planned, either as retaliation for his past treatment of defendant, or over the dispute about the cell phone, or something else.  Based on the facts and the reasonable inferences from them, the evidence was sufficient of both intent and affirmative acts.  The jury's verdict was therefore supported by substantial evidence.

## B.  Prosecutorial Misconduct

### 1.  General Principles and Standard of Review[3]

Defendant next argues the prosecutor, Paul Singh Brar, committed multiple instances of misconduct that so infected the trial, reversal is mandated.  Prosecutorial misconduct violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.  (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642-643; *People v. Hill*, *supra*, 17 Cal.4th at p. 819.)  Misconduct by a prosecutor that does not render a criminal trial fundamentally unfair is error under state law "if it involves the use of

---

[3]      Many of the alleged instances of misconduct set forth below were not objected to during trial by the defense.  Respondent argues these are forfeited.  Defendant argues, for the first time in her reply brief, that any failure to object constitutes ineffective assistance of counsel.  This argument is less than a page and a half long, and not under a separate heading.  (Cal. Rules of Court, rule 8.204(a)(1)(B).)  This is improper.  Given the record, defendant should have anticipated the waiver argument and included any ineffective assistance claim in her opening brief, where respondent would have a chance to reply to it.  (See, e.g., *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)  In the interests of justice, however, we shall address defendant's claims on their merits, but counsel is cautioned to avoid similar briefing errors in the future.

     Further, defendant's arguments on the separate instances of conduct allegedly constituting prosecutorial misconduct are not separated particularly well.  Facts and the relevant legal arguments are often pages apart.  We have tried to isolate and separately analyze these instances as best we can.

deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

Only misconduct that prejudices a defendant requires reversal. (*People v. Fields* (1983) 35 Cal.3d 329, 363.) Where prosecutorial misconduct infringes upon a defendant's constitutional rights, reversal is required unless the reviewing court determines beyond a reasonable doubt that the misconduct did not affect the jury's verdict. (*Chapman v. California* (1967) 386 U.S. 18; *People v. Hall* (2000) 82 Cal.App.4th 813, 817, citing *People v. Harris* (1989) 47 Cal.3d 1047, 1083.) Prosecutorial misconduct that violates state law is only cause for reversal when it is reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the untoward conduct. (*People v. Watson* (1956) 46 Cal.2d 818; *People v. Milner* (1988) 45 Cal.3d 227, 245.)

A prosecutor, however, is entitled to argue his or her case vigorously, and is therefore entitled to wide latitude in closing argument. (*People v. Tully* (2012) 54 Cal.4th 952, 1043.) Further, "'[a] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'" (*Boyde v. California* (1990) 494 U.S. 370, 385.)

### 2. Discovery Violations

During opening statement, the prosecutor apparently made a comment that Cordeiro still suffers headaches as a result of the assault.[4] Afterward, Izaguirre's attorney objected to this statement because no discovery on that issue had been released to the defense. The prosecutor admitted that he had learned of this fact the week before. All earlier medical records had been transmitted to the defense. The trial judge

---

[4]     The opening statement was not transcribed; we have the record of the objection, but not what the prosecutor actually said.

10

admonished the prosecutor, and invited defense counsel to propose additional sanctions. After a conversation off the record, the prosecutor agreed not to offer any evidence about the headaches or other continuing medical problems. Defense counsel indicated they were satisfied.

During Oregel's testimony, the prosecutor asked Oregel if he had previously testified that either Romero or Izaguirre had stolen a cell phone case while inside of the store. Defense counsel objected, the objections were sustained, and a discussion was held outside the presence of the jury. The prosecutor stated Oregel could testify there was physical evidence that supported his opinion a phone case might have been stolen. The court decided the objection, for a number of reasons, was properly sustained, but the prosecutor could ask if he saw physical evidence — such as an empty package — that a cell phone case had been stolen. The court asked defense counsel for suggested limiting instructions, and defendant's attorney requested nothing. Izaguirre's counsel stated that he was hearing about the alleged theft for the first time.

The jury then returned and the court instructed it that the limited purpose of the testimony was to explain the conduct of Oregel. Oregel then testified that he had seen Izaguirre or Romero "grab" a cell phone case, and Oregel saw an empty package in the area. Izaguirre's attorney made several objections during this testimony; defendant's attorney did not.

After Oregel's testimony, Izaguirre's counsel asked to be heard outside the presence of the jury on a discovery concern. The court examined the witness regarding the timing of his disclosure to the prosecutor about the cell phone case. Oregel was sure that "at some point" he had told the prosecutor. The prosecutor told the court that Oregel had disclosed this information after Romero's counsel asked Oregel about Romero and Izaguirre stealing, and Oregel answered, "I thought they stole cell phone cases." The prosecutor asked him about it during a break, and Oregel told him about the purported theft and the discarded package at that time.

11

The court did not find this explanation acceptable, and concluded a discovery violation had occurred. When considering possible sanctions, the court noted the evidence was relevant, and if a mistrial was declared as a result of the discovery violation, a second jury would hear this evidence. Defense counsels suggested remedies included dismissal or a request for a curative instruction. A mistrial was not requested.

After much discussion, the court found the prosecutor had committed a discovery violation by failing to disclose Oregel's statements about the cell phone case. The court did not find the prosecutor's motive was a tactical or unfair advantage, but prejudice had nonetheless resulted. The court denied the motions of all three defendants to dismiss the case and also declined Izaguirre's request to exclude the evidence. The court decided to allow full cross-examination of Oregel regarding what was disclosed to the prosecutor and when. The court also asked the defendants' attorneys to prepare an appropriate instruction. Further, in light of the two instances where the prosecutor had discovered new information immediately before or during breaks in testimony, the court ordered the prosecutor not to have further contact with the remaining witnesses, who included Cordeiro and the police officer who arrived on scene.[5]

After conferring with counsel, the court gave the following instruction to the jury regarding the prosecutor's discovery violation: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] You heard testimony that an empty cell phone container was located inside Kohl's shortly after the alleged

---

[5]      Romero's counsel later argued the prosecutor violated this order by talking to a colleague in the hallway, with Cordeiro's family immediately behind him. The prosecutor then spoke to Cordeiro's family, who spoke to Cordeiro thereafter. The court felt action at that time would be inappropriate, but stated if there was evidence the spirit of the no-contact order was being violated, the court would address it. To the extent defendant's brief argument on this point suggests this was a separate instance of misconduct, we disagree.

commission of the charged crimes. The People were aware of the evidence and willfully failed to disclose it to the defense. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that nondisclosure."

In addition, Romero's counsel both repeated this instruction and discussed it during closing argument. The prosecutor raised the issue only in the context of Romero's testimony that he was watching both Izaguirre and defendant at the same time.

There is no question the prosecutor seriously erred by failing to disclose relevant evidence prior to arguing it during opening statements or eliciting testimony on the subject. Such failures are serious and to be discouraged in the strongest possible terms. Nonetheless, we must also consider the violation within the full context of the case, and the burden is on defendant to demonstrate the remedy was inadequate to the impropriety. (*People v. Tully*, *supra*, 54 Cal.4th at p. 1014.)

With respect to the headaches, the error was remedied. Defendant does not argue otherwise. She also does not argue prejudice resulted from this particular error alone. To the extent defendant argues this conduct was intentional, the court found otherwise. The record reflects the prosecutor thereafter did as promised and did not present any evidence or argument regarding continuing medical problems as a result of the assault. The jury was properly instructed to decide the case based on the evidence rather than argument, and absent some indication in the record, we presume the jury followed the court's instructions and that its verdict reflects the limitations the instructions imposed. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1337.)

With respect to the cell phone, the facts about the theft or nontheft of the cell phone case were unnecessary to prove the assault with intent to cause great bodily injury. At best, such evidence might, possibly, have shed some light on whether the attack was preplanned or spontaneous, but not much. Defendant points to no evidence the allegedly stolen case would have been the right type for the cell phone Cordeiro had purportedly wrongfully kept. Further, the video evidence so strongly contradicts such a

13

claim that it was highly unlikely a more favorable outcome would have resulted for defendant absent this evidence. The jury acquitted on the attempted robbery count, which supports the conclusion this evidence was neither particularly important or persuasive. While the failure to disclose was misconduct, it does not rise to the level of reversible error, whether the incidents are considered separately or together.

### 3. Prosecutor's Reaction to Defense Counsel

Defendant next argues that the prosecutor's behavior toward defense counsel constituted misconduct. In one instance, the prosecutor asked a witness a question, and Izaguirre's counsel objected the question had been asked and answered. According to the court, the prosecutor shouted out "it was never answered" after the court overruled the objection. The court excused the jury and admonished the prosecutor. When asked why he reacted as he did, the prosecutor stated he felt counsel was objecting in bad faith, objecting just for the sake of it without listening to the testimony. The court indicated that such issues were its responsibility, not counsel's, and the prosecutor apologized. Defense counsel did not object, or request the court to take further action.

Defendant argues the prosecutor's ill-advised choice to raise his voice "allowed the jury to view an implication that defense counsel were not prepared or were obstructionists, through the prosecutor's tone and side comments regarding objections . . . ." But a single comment does not a pattern make. This outburst occurred fairly early in the trial, and there are no indications it was a repeated pattern. It also did not involve defendant or her counsel specifically, as it was Izaguirre's attorney who was involved with this incident. Moreover, defendant's suggested implication is not the only one. The jury could equally have inferred that the prosecutor lacked manners, was intemperate, foolish, or even desperate about the state of his case. We do not, therefore, find that one outburst arises to the level of misconduct.

14

### 4. *Arousing Passion or Prejudice*

Defendant next brings up statements the prosecutor made during closing argument, arguing they were intended to "arouse passion or prejudice." The prosecutor argued the failure to take the disputed cell phone did not constitute grounds for acquittal. "Why would they? They beat him unconscious per the testimony of the victim. The video supports that. There is some reason they suddenly stop, and really insofar as these two now know, Brandon Cordeiro could just as soon be dead. [¶] Would you want a dead man's cellular phone on you?" The court overruled Izaguirre's counsel's objection, and we agree with the court. While the prosecutor should not argue facts not in evidence, he or she has flexibility to discuss the case and opine about what the evidence shows. (*People v. Tully, supra,* 54 Cal.4th at p. 1043.) Indeed, the notion that Cordeiro could have been dead was not an absurd one, and not outside the range of reasonable argument on this point. Given the context of the surrounding argument, nothing supports defendant's claim this statement was intended to arouse prejudice or passion.

### 5. *Vouching for Cordeiro and Disparaging Counsel*

Defendant argues the following statements by the prosecutor during closing argument amounted to inappropriately vouching for Cordeiro's credibility and disparaging counsel. During closing statement, the prosecutor argued: "If you remember the way Mr. Romero's case began in opening statement, you'll remember Mr. Romero's attorney standing up to each of you and saying, 'You will see this case was about self-defense. . . .' That's what you were told at the beginning of this case. [¶] What was defense counsel's closing argument to each of you late last afternoon? It was, 'Yeah, he shouldn't have beaten him. He had no excuse for beating him. He was wrong. He screwed up.'"

15

"Where was the self-defense claim then? And what has changed in the interim to get defense counsel to the point where he's even willing to admit his client committed a crime?" The prosecutor then rejected the idea that any such change was as a result of the video, Oregel's testimony, or Romero's testimony, and continued: "What is the only thing that could have possibly changed even the defense attorney's mind? It was Mr. Cordeiro's testimony. That's it. And so I'm supposed to believe Mr. Cordeiro was such an unbelievable witness? Well, he sure convinced you."

Discussing defense counsel's claims that Cordeiro was not believable,[6] the prosecutor said: "Then we're told, 'Well, Cordeiro can't be believed because what is it he said about how many times he was punched?' Well, that goes to the issue of the battery. And that witness was so convincing, he convinced Romero's own defense attorney to change his argument from self-defense, which is what he said the evidence would show, to 'Oh, no, he shouldn't have beaten him. Yeah, that was not the right thing to do. He's guilty of that.' So Mr. Cordeiro must not have been that incredible; right? That doesn't make any kind of sense at all."

Later, the prosecutor argued, "Defense counsel said Mr. Cordeiro admitted to lying. Really? Play back his testimony . . . . Where does he say that? You know his testimony is bona fide. It was good enough to convince the defense attorney. I don't know why it wouldn't be good enough to convince all twelve of you."

The prosecutor then discussed and rejected defense counsel's arguments regarding the youth of the defendants and suggested defense counsel's use of the word "kids" to describe their clients was an attempt to garner sympathy. Izaguirre's attorney objected at that point, and out of the presence of the jury, the court told the prosecutor the objection was sustained, and stated that attacking the state of mind of counsel was improper. He was warned to discontinue such argument. The court stated it would

---

6          Defense counsel made this argument at numerous points.

16

instruct the jury that what counsel thought was irrelevant, and they were to base their decision on the evidence. Counsel for defendant joined Izaguirre's objection and submitted.

The trial court then instructed the jury: "Ladies and gentlemen, right before the break, there [were] statements by the prosecutor having to do with defense counsel, and that would include all three defense attorneys, informing you of what defense attorneys were thinking, their thought process, how their thought process may have changed from opening statement to closing argument. I'm here ordering you to disregard those comments by the prosecutor. The state of mind of the attorneys are just not relevant for your job, and that is to determine the facts which includes determining believability of witnesses, and then once you determine the facts and reasonable inferences to be drawn, applying it to the law. That is your job. What counsel thinks, what positions they've had that may have changed has no bearing on that."

First, with respect to the disparagement issue, while disparaging counsel can rise to the level of prosecutorial misconduct, we decline to find the prosecutor's remarks here rose to the level of "rude or intemperate behavior" (*People v. Hill*, *supra*, at p. 820) required to find misconduct. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1303.)

With regard to the issue of vouching for a witness's credibility, prosecutors may not vouch "for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial. [Citation.] However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching. [Citations.]"

17

(*People v. Frye* (1998) 18 Cal.4th 894, 971, 77, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see also *People v. Fernandez* (2013) 216 Cal.App.4th 540, 561.)

There is no reasonable likelihood a juror would understand the prosecutor's remarks as vouching for Cordeiro's credibility. The prosecutor was attempting to use the defense's change in theory to suggest defense counsel must have believed Cordeiro, and therefore he was believable. Given that defense counsel continually attacked Cordeiro's credibility, this is, frankly, a silly argument for the prosecutor to have made. It is difficult to imagine the jury gave it any credence at all. Further, the argument did not involve the prosecutor using the prestige of his office to bolster Cordeiro's credibility. It was simply an ill-conceived, and most likely ineffective, attempt to do so based on the record. We find no misconduct occurred with respect to this argument, and any issue it might have raised was cured by the court's instruction.

### 6. *Cumulative Misconduct*

Finally, defendant argues the prosecutorial misconduct was so pervasive as to undermine defendant's right to a fair trial. Yet we have rejected the bulk of her claims, finding only that the discovery violations arose to the level of misconduct. As we explained *ante*, as much as we abhor such actions by prosecutors, the misconduct with respect to discovery does not require reversal. We therefore find no cumulative misconduct.

Because the prosecutor's misconduct did not result in a reversal, we need not report this issue to the State Bar of California. (Bus. & Prof. Code, § 6086.7.) We do recommend, however, that Brar's superiors take appropriate action with regards to training or internal discipline to prevent such incidents of misconduct in the future.

18

## III

## DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.