Filed 8/8/16  P. v. Freeman CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>LANIER FREEMAN,<br><br>　　　Defendant and Appellant. | B259205<br><br>(Los Angeles County<br>Super. Ct. No. BA394266) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Leslie A. Swain, Judge.  Affirmed.

Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel and William N. Frank, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Appealing his convictions of possession of marijuana for sale and carrying a loaded weapon after defending with the California Compassionate Use Act, defendant asserts that the trial court prejudicially erred in instructing the jury and that the prosecutor committed prejudicial misconduct. We affirm.

## PROCEDURAL BACKGROUND

A jury convicted defendant Lanier Freeman of possession of marijuana for sale in violation of Health and Safety Code[1] section 11359 (count 1) and of carrying a loaded weapon in a vehicle in violation of Penal Code section 25850, subdivision (a) (count 3). The jury acquitted defendant of a charge that he was carrying a loaded weapon on his person (Pen. Code, § 25850, subd. (a)) (count 2).

After denying a new trial motion, the trial court imposed and then suspended sentence on defendant. The court placed defendant on three years of formal probation on count 1, with concurrent summary probation as to count 3. The court ordered defendant to serve two days in county jail, with credit for time served.

Defendant contends on appeal: (1) during argument, the prosecutor second-guessed the physician's recommendation that defendant should use medical marijuana, which misled the jury into believing it could reject defendant's Compassionate Use Act (§ 11362.5) defense; (2) the trial court erred in failing to give a curative instruction to redirect the jury from the misleading statements in the prosecutor's argument; (3) defendant received ineffective assistance of counsel if the instructional and prosecutorial conduct claims have not been preserved for review; (4) defense counsel was ineffective for failing to object to the prosecutor's rebuttal argument that undermined the People's burden of proof beyond a reasonable doubt; and (5) the cumulative effect of the errors requires that the judgment be reversed.

---

[1] All further statutory references are to the Health and Safety Code unless otherwise stated.

2

# TRIAL

## I. Prosecution Evidence

Los Angeles Police Department (LAPD) Officers Jose Reyes and Dana Oviatt were patrolling on February 3, 2012, at around 8:30 p.m., in their assigned area that includes Cimarron Street and Manchester Avenue in the City of Los Angeles. The area was known to the officers for its high narcotics and gang activities. The officers were in full uniform in an unmarked, silver police vehicle.

With Officer Reyes driving, the officers pulled into a strip mall where most of the businesses were closed, but some individuals were congregating at the rear next to a black Jeep Cherokee.[2] As he pulled up in the unmarked vehicle, Officer Reyes saw defendant. Officer Reyes stopped the vehicle in front of the Jeep, and Officer Oviatt got out and walked toward the Jeep. Defendant reached underneath his waistband, pulled out a medium-sized handgun, walked toward the right rear passenger door of the Jeep and tossed the handgun into the car. Defendant then slammed the door and walked to the rear of the Jeep.

As Officer Oviatt walked toward the rear of Jeep, he told defendant and the other individuals that he had received a report of a fight at the location. Officer Oviatt falsely said there was a fight report because he wanted to deescalate the situation. After the two officers handcuffed defendant, Officer Oviatt searched defendant's pockets and found $741 in large and small bills.

After defendant was handcuffed, Officer Reyes went to the Jeep to recover the handgun. Before Officer Reyes went to the Jeep, defendant said, "I'm a former cop. I didn't want to get caught with it." Officer Reyes thought defendant was referring to the handgun that defendant had just tossed into the Jeep. Defendant added that, in the past, he had worked for the Compton Police Department for five years.

---

[2]    According to defendant, the vehicle was a Jeep Liberty.

3

While searching the Jeep, Officer Reyes found a Glock handgun on the floorboard. The Glock had one live round chambered and a magazine with nine bullets. As he continued to search the vehicle, he found on the rear seat next to a backpack an additional firearm magazine with nine rounds. Searching the backpack, Officer Reyes found several loose .38-caliber bullets, prompting him to search the rest of the vehicle to find a gun that matched the bullets. Officer Reyes did not find a gun that went with the .38-caliber bullets. However, the backpack also contained 7.62-caliber rifle bullets in a magazine. There were bullets of different sizes throughout the vehicle. Officer Reyes eventually found four empty magazines, three of which would have fit a Bersa Thunder .380 and the fourth would fit a .25-caliber handgun, which was never recovered.

Officer Reyes subsequently showed the .38 rounds to Officer Oviatt and told him that he could not find the gun. Defendant then stated that the gun was not a .38 but a .357, which was inside a locked black briefcase. Defendant told the officers that the .357 was loaded. Defendant provided the combination to the briefcase, which contained four additional handguns: a loaded .357 Smith and Wesson revolver, an unloaded Derringer, an unloaded Bersa Thunder .380 (with a missing outside grip), and an unloaded .380 Thunder 5 revolver that fires rifle rounds.

As Officer Reyes searched the rear of the Jeep for guns, there was a strong marijuana odor coming from the cargo area. Officer Reyes saw a paper bag which contained a digital scale and nine Mason jars with a leafy substance. Officer Reyes recognized the substance as marijuana. Nine jars were labeled as "Sour Diesel," "Master Kush," "Green Crack," "Train Wreck," "Bubba Kush," "Blue Dream," "O Kush," "Black" and "Tai." Each of the nine jars contained about one ounce of dried marijuana in "bud" form. Other than the digital scale and marijuana, there was no other narcotics paraphernalia in the Jeep. There were no Ziploc bags, no smaller prepackaged baggies, no client lists, or other items normally associated with the sale of marijuana.

Defendant did not mention that he had a medical recommendation for the use of marijuana. While they were still at the scene, defendant told the officers that he lived in Beverly Hills. He also said that he was an unemployed security guard. While defendant

4

was being transported to the police station, Officer Oviatt asked him if he had a concealed weapons permit.  Defendant replied that he did not.

## II.  Prosecution Expert Evidence Concerning Marijuana for Sale

Eric Bixler, an LAPD detective, testified as a narcotics expert.  In Detective Bixler's opinion, an individual who possessed nine ounces of marijuana, under the circumstances in which defendant was arrested, would do so for the purpose of sale.  The circumstances included:  (1) a person is in a strip mall parking lot at 8:30 p.m.; (2) the person is at the rear of a vehicle with nine Mason jars with an even amount of marijuana bud in each jar; (3) each jar has an individual name; (4) there is a digital scale with the jars; (5) the person is unemployed and has $740 in cash on him; (6) the person lives in a different city than that where the vehicle is parked; (7) there is no drug paraphernalia for use in smoking marijuana; and (8) the person is armed with a loaded .40-caliber Glock handgun and has a loaded .357-caliber handgun near the marijuana.  Detective Bixler testified that drug dealers often use firearms to protect the narcotics and the cash from the sales.  About 85 percent of the people he had arrested for possession for sale had firearms.

Detective Bixler opined that an individual would not have nine differently labeled jars for personal use because users tend to stick to one type of marijuana.  Detective Bixler had contact with thousands of users but could not recall an individual person having marijuana stored in that many different jars with that much marijuana.  That amount of marijuana for personal use would last a single person who smokes a lot about six months.  It is very common for sellers on the street to have Mason jars or some other container such as Tupperware to seal and keep the moisture in the bud and to prevent the smell from coming out.

On cross-examination, Detective Bixler testified that medical marijuana users tended to buy their supplies on a weekly basis and did not store them at home.  The amount that they have on hand would depend on their medical need.

Detective Bixler testified that there was no law that required medical marijuana users to buy their marijuana or prevented them from growing their own.  Medical

marijuana users with recommendations, who grow their own marijuana, pick the amount they need off the plants.  If they store it, they usually put it in a Ziploc bag and stick it in the freezer.

The only people he had seen who store marijuana in a bulk like that in jars are dealers.  Medical marijuana users also do not use scales to weigh their purchases because it would be weighed at a dispensary.  The weight is usually not relevant because the pertinent thing is the amount of Tetrahydrocannabinol (THC) in the plant.  They do not store the marijuana in Mason jars but in pill bottles.  Users who grow their own do not normally use scales because they estimate the amount they need by sight.

Detective Bixler had experience with medical marijuana users who use tinctures or ointments.  In his experience, individuals who use marijuana in tincture or ointment forms will purchase it because it is very difficult to make.

On cross-examination, Detective Bixler testified that, in his opinion, if there were no pill bottles, baggies or other packaging, the individual would be selling more by the ounce or by the pound.  The lack of packaging for smaller amounts simply made him believe defendant was a bulk dealer rather than a gram dealer because of the amount of marijuana.  That amount of marijuana stored in a vehicle would cause the THC content to denigrate "real quick."  Detective Bixler testified that "[y]ou can't store it like that for personal use."

On redirect, Detective Bixler testified that marijuana stored and sealed in a Mason jar can denigrate about 50 percent overnight if it is warm outside.  If it is stored in a cool, dry place or a freezer in a vacuum-sealed container, the marijuana's THC potency can be maintained for a year.

### III.  Defendant's Evidence

Defendant testified he was a police officer with the City of Compton from 1997 to 2000.  He worked as a jailer for the police department for two years prior to that.  He took a family medical leave of absence in 2000 when his wife was injured on her job.  During his absence from the police department, it merged with the Los Angeles County Sheriff's Department.  Defendant missed the deadline for applying to be a sheriff and was

unsuccessful in being reinstated.  He abandoned his efforts to be reinstated for financial reasons.

Defendant testified that, because of his arrest, he was currently employed to do security installations and courier work.  At the time of his arrest, he was a security guard but did not hold a license to possess a firearm because his licenses had expired.  He had been in the process of reapplying for the licenses.

On the date of his arrest in 2012, defendant was living in one of the upstairs commercial units at the arrest location.  Defendant was completing construction at one of the units to open a business.  For the majority of the week, he stayed there but not every night.  Defendant also had a home in Bellflower.  The Beverly Hills address is a mailing address.

He had guns in the Jeep because he was going to take them to be cleaned on his way to Bellflower but stopped to talk to someone at a beauty salon in the strip mall.  All the guns were locked and unloaded in a briefcase in the cargo area of the Jeep.  All the guns were registered to defendant.

When the police arrived, Officer Oviatt shined his light into the Jeep and defendant said, "Hey, that's mine.  I'm right here."  When Officer Oviatt said there was a report of a fight, defendant responded, "bullshit."  According to defendant, Officer Reyes then came from behind him and placed him in a control hold.  He asked defendant, "Where are the guns?"  Officer Reyes said that he had found a backpack with some ammunition in the Jeep.

Defendant testified that, as he was being handcuffed, he told the officers that his shoulder was injured.  Defendant denied having guns on him or making a statement that he did not want to get caught with a gun on his person.

Defendant had a recommendation to have medical marijuana for pain in his shoulder, a pinched nerve and headaches.  Defendant got the medical recommendation, which was dated January 30, 2012, from Dr. Lee Winkler.  On cross-examination, defendant testified that he had filled out a portion of the recommendation.  Defendant's shoulder pain stemmed from a torn rotator cuff, which had been re-aggravated when he

7

attended the police academy. The January 2012 recommendation was the second one defendant had obtained from Dr. Winkler's office. He obtained a recommendation a year before from Dr. Winkler. Defendant took his records to the office the first time he went but not the second time.

Defendant admitted that he had the nine Mason jars of marijuana in the Jeep. However, he had the marijuana with him because he was not staying at the unit that evening. Defendant had grown all the marijuana in the jars sometime around April or May 2011. Defendant grew the marijuana for use as tinctures, ointments and rubbing alcohol.

He testified that a tincture is made by taking the dried leaves of the cannabis plant and fusing it with butter or virgin oils. According to defendant, in the process, the active ingredients of the plant are extracted for medicinal reasons. The tincture is topical. He had been using tinctures since 2010 when he got his first recommendation. He was taking the jars home so he could make tincture at home. Nine ounces was "not a lot" of marijuana. Because he grew the marijuana outside, it was not the best quality. The nine ounces would only last him about a month. Defendant had made tinctures about 10 times; however, it was not an "exact science." There are multiple ways to make it. Defendant then described how he made the tincture by boiling the cannabis, straining it and using the extract to fuse it with other ingredients.

Defendant had a scale to calculate what worked best for him to determine how much cannabis mixed with the oil, salve or alcohol was needed to get relief from his pain. He labeled the jars because he grew different strains to see how they helped his pain. It took four months for a plant to mature. He used jars to keep moisture out and keep the marijuana fresh because the elements will damage the product in baggies. He was not selling marijuana on that night.

Defendant took classes about the medicinal benefits of marijuana as an alternative to prescription drugs, which were hurting his kidneys. He was also afraid of prescription drugs. He learned that it was safer to grow his own because he did not have to worry about contaminants of mold, fungus and mites from other people's products. As a former

8

police officer, he was aware that police officers considered marijuana to be a gateway drug and that all of its uses were bad.

## IV. Defendant's Expert Testimony

Nick Morrow, a private investigator, testified as an expert for the defense in the field of narcotics, drugs, possession for sales, sales, and medical marijuana. His expertise of medical marijuana included training on cultivation, packaging and topical preparations. It also included legal issues related to the Compassionate Use Act and the Medical Marijuana Program. (§ 11362.7 et seq.)

Morrow testified that a medical recommendation meant that a person could go to a medical marijuana dispensary collective or the person could grow the marijuana. It did not mean that the person could have an unlimited amount. The amount should be related to the individual's needs, use patterns and the particular condition that is being treated. People using for medical purposes tend to use more frequently but in smaller amounts than those who use marijuana to get "high." Pain patients will use several joints a day but take two to three puff doses to keep a level of THC and cannabidiol (CBD), which are the two major chemicals in cannabis, active in their bodies.

Patients ingesting marijuana or making tinctures or ointments use more bulk cannabis than those smoking it. If the patient is going to ingest the marijuana or make tinctures and ointments, the chemical needs to be extracted from the plant. The chemical extraction is then dissolved into a liquid such as ethyl alcohol or drinking alcohol. The tincture is placed under the tongue or absorbed into food.

According to Morrow, a patient who makes the tinctures or ointments needs different strains because there are hundreds of marijuana strains, which produce different effects. Some strains are very effective for pain while others are known for being effective on nausea and anxiety. Patients will try different strains until they find the one that best suits their needs. There are several ways to make a tincture or ointment. The process involves a lot of trial and error because the potency of the cannabis has different levels of THC, which may produce different results for each batch. Patients grow their own to control the quality because third party growers often use insecticides or fertilizers

9

that can be toxic.  They will grow the plants indoors to protect against insecticides and to control mold and fungus because some patients are highly sensitive.  It takes approximately eight to 14 weeks to complete the growth process.

Morrow said that patients who buy cannabis from collectives will limit the amount to daily or weekly portions.  They use the smaller containers from collectives such as a pill bottle or a Ziploc bag.  The standard container for storing cannabis is a quart-sized Mason jar to protect against light, heat and air.  Patients who grow their own cannabis will grow extra and store extra in the Mason jars because they do not know how successful each harvest will be.  They might lose some of their plants and they want to have enough for their condition.  Patients commonly have scales so that they know how to repeat a successful preparation.  They will also have scales to make sure a dispensary is not cheating them.

Defense counsel asked Morrow a hypothetical about whether the amount of marijuana was consistent with the circumstances of defendant's arrest and testimony about his medical recommendation and medical history.  Morrow opined that nine jars was consistent with use for pain and not for sale.  Morrow's opinion was based on the following:  (1) the person is a qualified patient with a recommendation; (2) the person has different types of marijuana preparations to treat pain; (3) topical and ointment preparations will help the spasticity and muscle pain; and (4) different strains are consistent with making the ointments.

The possession of a digital scale did not alter his opinion because the scale could be used for a variety of things in preparing the marijuana.  Morrow's opinion was not altered if the person had loaded guns and was 12 to 20 miles away from his residence.  Morrow did not consider the facts to be sufficient to establish that a person might be selling marijuana.

On cross-examination, Morrow testified that he had checked Dr. Winkler's credentials.  Dr. Winkler is a physician in good standing in the State of California.  There are good and bad physicians just like any profession.  Morrow agreed with the prosecutor that California's marijuana laws were "a joke."  Morrow agreed that people were out on

10

the street with letters of recommendation so that when they are arrested for selling marijuana on the street they can justify why they have the marijuana.

Morrow had a medical recommendation. He used tinctures but had not been successful in making his own so he went to a commercial brand.

Morrow testified that Detective Bixler's assertion that only street dealers package marijuana in Mason jars as "incredibly inaccurate." Selling on the street is a very high-speed activity so the dealer wants to sell as much as possible as quickly as it could be done. Marijuana dealers sell usable amounts in grams, eighths and ounces that are prepackaged. Morrow testified that dealing out of a glass jar in the street "is ridiculous" because they are big and bulky. A street dealer is not interested in storing marijuana but is more likely to deal with baggies to hide them from law enforcement or to sell the marijuana more quickly.

Morrow opined that nine ounces of a bud would produce a tincture that could be used three times a day for about a month. Nine ounces used for an ointment would last a lot longer depending on the patient's needs. There was no case law allowing a user to store his entire marijuana supply in the car but there was no law prohibiting him from doing so.

## V.  The Prosecution's Rebuttal

Detective Bixler testified that the Medical Marijuana Program was enacted to further implement the Compassionate Use Act by allowing group marijuana cultivation projects. With just a recommendation, the individual is limited to what is reasonably related to the medical condition. Under the Medical Marijuana Program, a patient with a recommendation can get a state-issued identification card from the county that allows an individual to grow six mature plants or 12 immature plants or possess eight ounces of dry manicure bud. However, there cannot be any evidence that the individual is selling the marijuana. Individuals may not sell marijuana or have an unlimited quantity on them under either the Compassionate Use Act or the Medical Marijuana Program.

While working undercover, Detective Bixler had obtained six or seven recommendations with a fictitious name and address. Typically, he would go into the

office, meet a receptionist, fill out some paperwork, and get called into the backroom. He might or might not see someone because there might be a monitor. He would describe an ailment and no questions would be asked. Detective Bixler went in a couple of weeks before the trial and got a recommendation for getting his ears pierced. He never supplied any medical documentation or records to support his illnesses before getting the recommendation.

Detective Bixler testified that the bud can be stored out of sunlight and in a cool place in a closed Mason jar for a year. There is no medicinal benefit to storing it because, if it is for medicine, the patient needs it. If a person is selling it, he or she needs to do so for the profit. Patients should not be storing it because, if the patient stores too much, he or she is subject to arrest.

Detective Bixler testified that most people who use marijuana smoke it to get "high." There is no other benefit to smoking marijuana. He explained that, generally, people do not use the bud to make tinctures because it is too valuable. People either sell it or smoke it because of the high concentration of THC on a bud. A person would not use the bud to make something else. Tinctures are made from "shake," which has THC on it. The shake is the trim from the harvest of the marijuana. It is possible to sell all the bud and still have part of the plant (the leaves) to make medicine. Most quality cultivation operators take the trimmings to make the medicine and sell the buds. If a person had nine ounces of the bud, he or she could produce between 18 to 27 quarts of tincture, depending on the strength of the bud's THC.

## VI. Argument

During argument, the prosecutor stated that a person could not have "unlimited marijuana" but that the amount had "to be reasonably related . . . to the defendant's current medical needs." The prosecutor noted that the defendant said he had a torn rotator cuff, knee pain and other complaints. The prosecutor then stated, "You can take his word for it. Would have been nice to hear from a doctor about that, wouldn't it? 'Cause a doctor can tell you what his medical condition is, what his injury really is. But go ahead take him at his word for it. He has got to do that, if you want to."

12

The prosecutor subsequently argued that defendant never went to the doctor except to get the recommendations, which did not have actual dosages. The prosecutor argued, "That is not an accident that is so you can come in to court and say however much you got caught with is what you need, right?"

The prosecutor further argued: "[Defendant] has got a letter, right, the letter of recommendation. But as you heard, you can go to a doctor, and if you find one to write you for getting your ears pierced. It is a joke. It doesn't mean he doesn't have the letter and not entitled to the defense, but it's a joke. So, there is [a] doctor. I guess that is Dr. Winkler's signature. There is Dr. Winkler's signature, right? And remember the defendant when I first asked him [if] Dr. Winkler filled all this out. He said, 'yes.' So then I asked him why are there two different handwritings here, you—when you see it in person you can see that, right? This cursive, the word security, is totally different from all the other stuff that the defendant eventually said he filled out."

The prosecutor argued: "Does that look anything like Dr. Winkler's signature. This is a doctor. This is their signature. That is how he writes. This is not Dr. Winkler. You don't know who the defendant saw when he went and got this letter of recommendation. But he could have been a talking head on the screen for all I know. The defendant said he saw Dr. Winkler."

In querying why there were two different handwritings on the recommendation, the prosecutor argued: "Say this is Dr. Winkler, right? This is what Dr. Winkler found important to hand notate himself about the defendant security. He worked security. That is right. You are prescribing an illegal narcotic[] for somebody, and that is what he decided. He had to handwrite down he worked security weightlifting. That might be relevant how he hurt himself. Then you got this thing back here. Dx diagnosis pain 20 years, left shoulder didn't actually circle the little thing then, rotator cuff tear."

The prosecutor also argued: "You know, Dr. Winkler 80 years old got his medical license in 1948. He's frail. Looks like the [Unabomber]. Don't hold that against me. But you know, why is he making these recommendations? It is easy money for him at

13

this point in his life.  You can probably go to him and say I want to get my ears pierced, and I am afraid it will hurt, and he will give you a letter of recommendation."

Defense counsel argued that defendant is a qualified marijuana patient with a valid recommendation from a licensed physician.  Defense counsel further argued:  "The recommendation that you saw and will have with you in the deliberation room.  He's a qualified patient today and he was so at the time of this incident.  He got his recommendation a few days before this incident from a licensed physician, someone licensed by the State of California with no administrative or disciplinary actions.  Mr. Morrow said he looked him up.  What's wrong with this doctor?  Nothing.  They have not put forth any evidence to say this recommendation is not valid; that the doctor is some whack job, right?  So, instead of engaging in this name-calling and making insinuations about this doctor's practice, why not put forth competent evidence to show you that this recommendation or this doctor is not who he says he is.  They have the burden of proof.  They have the subpoena power of the court to subpoena that witness in.  They have the manpower of LAPD, law enforcement to bring that witness in.  It's their burden to prove to you beyond a reasonable doubt that [defendant] was not allowed to have this marijuana and they haven't.  Nothing says that I have to."

In rebuttal, the prosecutor argued:  "And the defendant has a letter of recommendation.  He does.  So, he's allowed to have marijuana for medicinal use.  Dr. Winkler, is he just writing the prescriptions to make money?  I think the evidence supports that.  You can disagree with that.  That's fine.  I'm not challenging the fact that he has that letter for a recommendation.  He has that.  It still doesn't let him sell marijuana."

## VII.  New Trial Motion

After his conviction, defendant hired new defense counsel.  In a new trial motion, defendant argued, among other things, that the prosecutor repeatedly made inflammatory and improper comments about California's medical marijuana laws and Dr. Winkler.  Defendant also argued that the failure to object to the improper questioning and

14

arguments resulted in ineffective assistance of counsel. Defendant also challenged Detective Bixler's expertise and conduct during the trial.

In denying the new trial motion, the trial court indicated that, if defense counsel had objected to the prosecutor's comments, the objection would not have been sustained. The trial court ruled that the comments about Dr. Winkler were hyperbole and were within the great latitude afforded to counsel during argument. The trial court added, "I think the lines kind of got blurred, perhaps, about the process by which [defendant] got a recommendation and whether he possessed this marijuana for sale." In response to defendant's challenge to Detective Bixler's competency, the trial court stated that Detective Bixler "was a bit of a cowboy on the witness stand" but he was competent to testify as an expert.

## DISCUSSION

### I. The Compassionate Use Act Defense

The Compassionate Use Act (also known as Proposition 215), which is embodied in section 11362.5,[3] was adopted by the voters in November 1996. The measure was

---

[3] Section 11365.2 provides: "(a) This section shall be known and may be cited as the Compassionate Use Act of 1996. [¶] (b)(1) The people of the State of California hereby find and declare that the purposes of the Compassionate Use Act of 1996 are as follows: [¶] (A) To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief. [¶] (B) To ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction. [¶] (C) To encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana. [¶] (2) Nothing in this section shall be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others, nor to condone the diversion of marijuana for nonmedical purposes. [¶] (c) Notwithstanding any other provision of law, no physician in this state shall be punished, or denied any right or privilege, for having recommended marijuana to a patient for medical purposes. [¶] (d) Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a

15

enacted "[t]o ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana . . . ." (§ 11362.5, subd. (b)(1)(A).) Section 11362.5, subdivision (d) provides: "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."

The Compassionate Use Act gives partial immunity to qualified medical marijuana patients by providing an affirmative defense to the crimes of possession and cultivation. (*People v. Kelly* (2010) 47 Cal.4th 1008, 1013.) The statute does not specify the amount of marijuana that a patient may possess or cultivate; however, the marijuana must be "for the personal medical purposes of the patient." (§ 11362.5, subd. (d).) The test for this requirement is that "the quantity possessed by the patient or the primary caregiver, and the form and manner in which it is possessed, should be reasonably related to the patient's current medical needs." (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1549.) The defendant has the burden of proof to establish the facts of the defense but is only required "to raise a reasonable doubt as to those facts rather than to prove them by a preponderance of the evidence." (*People v. Mower* (2002) 28 Cal.4th 457, 464.)

"[T]he Compassionate Use Act is a narrowly drafted statute designed to allow a qualified patient and his or her primary caretaker to possess and cultivate marijuana for the patient's personal use despite the penal laws that outlaw these two acts for all others."

---

patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician. [¶] (e) For the purposes of this section, 'primary caregiver,' means the individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person."

16

(*People v. Uriziceanu* (2005) 132 Cal.App.4th 747, 772-773.)  However, "the enactment of the Compassionate Use Act did not alter the other statutory prohibitions related to marijuana, including those that bar the transportation, possession for sale, and sale of marijuana."  (*Id.* at p. 773.)

## II.  Instructional Error or Prosecutorial Misconduct

Defendant contends that he was prejudiced because the prosecutor was allowed to make unchallenged, derogatory comments about Dr. Winkler, the physician who made defendant's recommendation.  That, he claims, in turn misled the jury to believe it could second-guess the recommendation.[4]  Defendant asserts that, once the prosecutor misled the jury, the trial court should have given a curative instruction.  Hence, defendant's contention is that the trial court inadequately instructed the jury regarding Dr. Winkler's marijuana recommendation, which defendant relied on as a defense.

According to defendant, the contention concerns instructional error because the prosecutor "muddied the waters," and defendant cites as applicable law the cases of *People v. Beltran* (2013) 56 Cal.4th 935, 954-955, and footnote 15, *People v. Morgan* (2007) 42 Cal.4th 593, 611, and *People v. Milner* (1988) 45 Cal.3d 227, 254-258.  However, these cases do not support defendant's contention here.  Each of these three cases involved instructions which were either misleading or ambiguous.  And the arguments of the prosecutors gave the jurors a misleading perception, misdirected the jury, or created an ambiguity, which the trial court needed to rectify.

The trial court here correctly instructed the jury regarding the defendant's compassionate use defense as follows:  "Possession of marijuana is lawful, if authorized by the Compassionate Use Act, *what people have called the CUA*.  The Compassionate Use Act allows a person to possess marijuana for personal, medical purposes when a

---

**4**     At the hearing on the new trial motion, the trial court stated that if defense counsel had objected to the prosecutor's comments, the court would have overruled the objection.  The Attorney General does not dispute defendant's contention that the issues related to the comments have been preserved on appeal because of the trial court's statement at the new trial motion that an objection would have been futile.

17

physician has recommended or approved such use. The amount of marijuana possessed must be reasonably related to the patient's current medical needs. The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess marijuana for medical purposes. If the People have not met this burden, you must find the defendant not guilty of this crime."[5]

In *People v. Spark* (2004) 121 Cal.App.4th 259 (*Spark*), the trial court erroneously instructed the jury that one of the elements of the Compassionate Use Act defense was that the defendant had to be "'seriously ill.'" (*Spark*, at pp. 262, 268-269.) The appellate court concluded that the voters "did not intend to limit the compassionate use defense to those patients deemed by a jury to be 'seriously ill.'" (*Id.* at p. 268.) As a result, "the question of whether the medical use of marijuana is appropriate for a patient's illness is a determination to be made by a physician. A physician's determination on this medical issue is not to be second-guessed by jurors who might not deem the patient's condition to be sufficiently 'serious.'" (*Ibid.*) *Spark* concluded that the instructional error was prejudicial when coupled with counsels' (prosecution and defense) arguments that the jury was required to determine whether the defendant had to be seriously ill to qualify for the medical use of marijuana. (*Id*. at p. 269.)

In this case, unlike in *Spark*, the trial court included no erroneous language and correctly instructed the jury regarding the compassionate use defense. Defendant does not contend otherwise. We therefore find no instructional error. We are left with solely the question whether the prosecutor committed misconduct or misdirected the jury.

## III. Prosecutorial Misconduct

Defendant contends that the prosecutor committed misconduct that misled the jury to second-guess the determination that defendant had a valid medical recommendation. Defendant asserts that the prosecutor disparaged Dr. Winkler's assessment of defendant's marijuana recommendation as in *Spark*, *supra*, 121 Cal.App.4th 259. But, in *Spark*, it

---

[5]     The words in italics were added by the trial court in the court's oral reading of the instructions.

18

was a combination of the prosecutor's argument and an incorrect instruction about the marijuana Compassionate Use Act that enabled the jury to second-guess the marijuana recommendation. Here, there was no instructional error, and, as we determine, no prosecutorial misconduct.

The Court of Appeal in *Spark* did not consider nor did it hold that a prosecutor could not comment on the evidence of the marijuana recommendation. The prejudicial arguments in *Spark* were made by the prosecutor and defense counsel after the trial court erroneously instructed the jury that "serious illness" was an element of the compassionate use defense. By contrast, in this case during argument, the prosecutor did not ask the jury to determine that defendant had no medical condition that would permit him to use the marijuana. The prosecutor made a number of comments about the medical recommendation. However, those comments included concessions that defendant had a recommendation and was entitled to use marijuana for his condition.

Furthermore, the issue framed at trial was whether, based on the recommendation, defendant needed nine ounces of marijuana or whether that amount was reasonable. As the prosecutor stated, whether defendant had a recommendation or not, he could not legally sell marijuana.

The expert evidence and defendant's testimony on the amount, storage, cultivation time and percentage of marijuana needed to make tinctures was extensive and conflicting in many ways. This included testimony that defendant had nine ounces of marijuana in labeled Mason jars in the back of a Jeep, with loaded weapons. He had the nine jars in the parking lot of a strip mall, four days after he obtained a "second" recommendation. The prosecutor's argument centered on whether or not the evidence showed that the amount of marijuana in defendant's possession at the time of his arrest was reasonably related to defendant's current medical needs. The prosecutor's argument on this issue was fair even if it was aggressive. A prosecutor is given wide latitude in argument to vigorously advocate the case and to make fair comment on the evidence. (*People v. Stanley* (2006) 39 Cal.4th 913, 951.) Thus, we disagree with defendant that comments

19

about the recommendation were either unfair or somehow invited the jury to second-guess the determination that he needed medical marijuana.

The prosecutor did make, as defendant notes, some unflattering comments about Dr. Winkler. The prosecutor disparaged both the recommendation process in California ("it's a joke") and Dr. Winkler (saying he resembled the Unabomber).

"'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.) A prosecutor's conduct can render a criminal trial fundamentally unfair under state law if the prosecutor uses deceptive or reprehensible methods to attempt to persuade the jury or the court. (*People v. Hill*, *supra*, 17 Cal.4th at p. 819.) However, "'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness'" [citation], and he may "use appropriate epithets warranted by the evidence."'" [Citations.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 567-568.) A claim of prosecutorial misconduct is reviewed to determine whether there was a reasonable likelihood the jury considered the remarks in an objectionable manner. (*People v. Ayala* (2000) 23 Cal.4th 225, 284.) We examine the specific arguments that defendant finds objectionable.

Defendant claims that the prosecutor's argument improperly denigrated Dr. Winkler's assessment and the validity of the recommendation. Defendant cites the following argument of the prosecutor: "This is what Dr. Winkler found important to hand-notate himself about the defendant, security. He worked security. That is right. You are prescribing an illegal narcotic[] for somebody, and that is what he decided. He had to handwrite down he worked security weightlifting. That might be relevant how he

20

hurt himself. Then you got this thing back here. Dx diagnosis pain 20 years, left shoulder didn't actually circle the little thing then, rotator cuff tear." The prosecutor repeatedly reminded the jury that he was not questioning whether or not defendant had a condition for which the recommendation was needed. Rather, he argued that the amount of marijuana in defendant's possession was not reasonable to meet his current medical needs. Under the circumstances, we are not persuaded that the comments erroneously allowed the jury to make a determination that defendant did not need medical marijuana. The trial court properly instructed the jury on the compassionate use defense based on the evidence and also instructed that the prosecutor's comments were not evidence. The record does not support the claim that defense counsel was ineffective for failing to object to this argument.

Defendant also claims the prosecutor invited the jury to question Dr. Winkler's medical credentials, his mental capacity and whether the medical assessment was a ploy to make money. Defendant cites this argument: "You know, Dr. Winkler 80 years old got his medical license in 1948. He's frail. Looks like the [Unabomber]. Don't hold that against me. But you know, why is he making these recommendations? It is easy money for him at this point in his life. You can probably go to him and say I want to get my ears pierced, and I am afraid it will hurt, and he will give you a letter of recommendation." The trial court commented that the jury in all likelihood recognized the prosecutor's comments as hyperbole. We agree with the trial court.

In any event, during the trial, both prosecution and defense experts testified that there is often laxity when a recommendation is made. The defense expert testified that the marijuana laws were a joke. Detective Bixler testified that he had obtained a recommendation by stating that he was going to get his ears pierced. In light of this evidence, it was not beyond the pale for the prosecutor to comment about the ease by which recommendations are made.

In sum, we cannot conclude the prosecutor's statements were "'"'so egregious'"'" that they infected the trial with such unfairness that defendant's conviction resulted in a denial of due process. (*People v. Gionis*, *supra*, 9 Cal.4th at p. 1214.) Moreover, we

21

conclude that none of the charged instances amount to misconduct and, if one or more of the prosecutor's statements was arguably misconduct, it was harmless in light of the evidence of defendant's guilt. (*People v. Hardy* (1992) 2 Cal.4th 86, 173.) None of the statements together or alone resulted in an unfair violation of either defendant's state of federal constitutional rights.

## III. Ineffective Assistance of Counsel

Defendant contends that defense counsel's failure to object to the prosecutor's conduct constituted ineffective assistance of counsel. We disagree.

Even if a reasonable juror might have taken to heart the argument about Dr. Winkler's credentials, the record does not support the contention that counsel provided ineffective assistance by failing to object. Indeed, defense counsel presented evidence that Dr. Winkler was a doctor in good standing in the State of California. In argument, defense counsel vigorously asserted that the prosecution's comments about Dr. Winkler should be ignored. We cannot conclude that defense counsel was remiss in failing to object based on the record on appeal.

Defendant finds objectionable the prosecutor's comment made after defense counsel's argument. The prosecutor stated: "Dr. Winkler, is he just writing the prescriptions to make money? I think the evidence supports that." The prosecutor's comment was fleeting at most and, as defendant concedes, the prosecutor immediately told the jury that it was free to disagree with him. The prosecutor then stated that he was not challenging the recommendation but that it did not permit defendant to sell marijuana. Because the remark was brief and fleeting, even if counsel had objected or the remark was in fact misconduct, such could not possibly have prejudiced defendant.

For those reasons, relief is also not warranted in this appeal on the theory of ineffective counsel because of defense counsel's failure to object to comments about Dr. Winkler's recommendation.

Defendant also contends he was denied effective assistance of counsel because defense counsel failed to object to the prosecutor's rebuttal argument on reasonable doubt. "A defendant is presumed innocent until proven guilty, and the government has

the burden to prove guilt, beyond a reasonable doubt, as to each element of each charged offense. [Citations.]" (*People v. Booker* (2011) 51 Cal.4th 141, 184-185.) Defendant claims that the prosecutor's argument undermined the People's burden of proof. We disagree.

Defense counsel argued on the meaning of an "abiding conviction." He argued: "If you were to look those words up in the dictionary, 'abiding' means long lasting. 'Conviction' means a belief. If you reinsert that definition into that sentence, you would get my interpretation of what proof beyond a reasonable doubt is. Proof beyond a reasonable doubt is proof that leaves you with a long lasting belief that these charges are true. That belief has to be so long lasting that when you think about how much you've enjoyed your stay here in Department 131 on this trial, sometime in the future, whether it be next week, next month, sometime down the line, when you think about your decision in this case, you're not going to question. But if there's a question on whether or not they've proven this case to you, that's not enough. It's maybe possibly, just like we talked about in jury selection, it's not enough. You have to have a long lasting belief."

In rebuttal, the prosecutor argued: "Proof beyond a reasonable doubt. That's what the standard is that you judge everything by during this case. Reasonable doubt, what does that mean? Do you have a doubt? You take a look at it. You examine it. Is that doubt reasonable? Okay. Not guilty. But if that doubt is a possibility, might have been, could have been, well I just can't be too sure, so I'm not going to take a chance, that's not reasonable doubt. Reasonable doubt, I don't have to eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt. You don't have to imagine that. You can. Actually, defense attorneys when they talk to you about beyond a reasonable doubt, they seize on that abiding conviction language. What does that mean? In reality that means that you find the defendant is guilty. Defense attorneys want—want you to think it's an impossible standard. It can never be met, when in reality people are convicted of crimes Monday through Friday in courthouses throughout this country with this standard. It's beyond a reasonable doubt, not beyond all possible doubt."

23

The prosecutor further argued: "Defense attorneys want you to think in a week oh, no. You're going to think about something else and regret it in a month, 10 years, when you're on your death bed and think about this case and say, you know what? I didn't have an abiding conviction. There's no way, if you go by that standard, could you ever find somebody guilty and that's not the standard. It's do you have a doubt. All right. Look, if it's reasonable, yes. Okay, not guilty, but if it's not reasonable, right, if it's possible, maybe, could have, that is not beyond a reasonable doubt. That means guilty. So, when you're back there and you're talking to each other and you all will talk about things, you will talk about all of this stuff. You will talk about things that are possible and might have been, could have been as you sort through the facts and evidence. That is perfectly fine. You should do that, but when somebody goes down the well, you know what, it's possible. It happened this way, so I'm voting not guilty. It's the rest of yours' [*sic*] job to remind them, well, yeah. It's possible, but it is not reasonable based on the facts and the evidence."

According to defendant, defense counsel should have objected to the prosecutor's argument that a doubt is not reasonable if it amounts to a mere possibility of innocence or if defendant could have been innocent. Even if error is assumed by these statements, we could not find prejudice under the circumstances of this case.

To begin with, the statements that defendant finds objectionable appear to be taken out of context of the argument in which they were stated. More importantly, the trial court instructed the jury with CALCRIM No. 220 on the presumption of innocence and the prosecution's burden to prove defendant guilty beyond a reasonable doubt. The jury was instructed that: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible of imaginary doubt." The trial court gave CALCRIM No. 359, which instructed the jury that "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

24

The trial court instructed the jury with CALCRIM No. 222 that "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."

The jury was instructed on the elements of possession for sale of marijuana (§§ 11018, 11359) and the lesser included offense of simple possession (§ 11357, subd. (c)).

In accordance with defendant's compassionate use defense, the trial court instructed that: "The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess marijuana for medical purposes. If the People have not met this burden, you must find the defendant not guilty of this crime."

In addition to the trial court's instructions on the prosecution's burden of proof, both the prosecutor and defense counsel emphasized that the prosecutor had the burden of proof on the issues at trial. Defense counsel stressed that defendant had no burden of proof on the issue of guilt. Under the circumstances, we cannot conclude that the prosecutor's reasonable doubt argument requires reversal or that defense counsel was ineffective in representing defendant. In any event, it is not reasonably probable that the prosecutor's statements contributed to the verdict given the overwhelming evidence of defendant's guilt.

## IV. Cumulative Error

Defendant claims that the judgment must be reversed because of numerous errors by the trial court, the prosecutor and defense counsel. We have found no prejudicial errors. Accordingly, we must affirm the judgment.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:

ASHMANN-GERST, J.          HOFFSTADT, J.

25